Michael STRATECHUK, Individually and on behalf of his minor children, Appellant

v.

BOARD OF EDUCATION, SOUTH ORANGE–MAPLEWOOD SCHOOL DISTRICT; Brian F. O'Leary, In his official capacity as board president, Board of Education, South Orange–Maplewood School District; Peter P. Horoshak, In his official capacity as superintendent, South Orange–Maplewood School District.

No. 08–3826.

United States Court of Appeals, Third Circuit.

Argued Sept. 14, 2009.

Filed: Nov. 24, 2009.

Christopher A. Ferrara, American Catholic Lawyers Association, Inc., Fairfield, NJ, Robert J. Muise, (Argued), Ann Arbor, MI, for Appellant.

Michael F. O'Neill (Argued), Purcell, Ries, Shannon, Mulcahy & O'Neill, Bedminster, NJ, for Appellee.

Robert B. Hoffman, (Argued) Eckert, Seamans, Cherin & Mellott, Harrisburgh, PA, for Amici Anti–Defamation League, Jewish Congress, Jewish Council for Public Affairs, American Jewish Committee, National Council of Jewish Women.

Before: SLOVITER, FUENTES, and SMITH, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The issue before us is whether a School District, in order to maintain a policy of complete religious neutrality, may prohibit celebratory religious music at school-sponsored events. The District Court, in a careful analysis of the facts on record and the applicable law, upheld the School District's discretion to maintain and enforce

its policy. *Stratechuk v. Bd. of Educ., S. Orange–Maplewood Sch. Dist.*, 577 F.Supp.2d 731 (D.N.J.2008).

The unsuccessful plaintiff, Michael Stratechuk, the father of two students in the School District of South Orange–Maplewood, New Jersey ("School District"), appeals the District Court's grant of summary judgment in favor of the School District (and related defendants) on Stratechuk's claims filed pursuant to 42 U.S.C. § 1983, that the School District's policy on the performance of religious holiday music violates the Establishment Clause and his children's First Amendment "right to receive information and ideas, right to learn, and right to academic freedom." *Id.* at 749.

## I.

### Factual and Procedural Background

Policy 2270, "Religion in the Schools" ("Policy 2270"), was adopted on April 2, 2001, by the South Orange–Maplewood Board of Education. It provided that:

It is the goal of the [School District] to foster mutual understanding and respect for the right of all individuals regarding their beliefs, values and customs. In pursuing this goal, we recognize that we serve a diverse community with varying cultural, ethnic and religious orientation.

We are cognizant of the role of culture, including religion, in the development of our society and believe that objectively teaching about religion and its role in the social and historical development of civilization does not violate the religious neutrality of the public schools.

Music, art, literature, dance and drama along with religious customs and traditions, which have come to us from various elements of our national population, may be used to broaden our pupils'

awareness of the many elements that comprise our diverse American culture. In any reference to religion in the schools, the district is guided by the following concepts when determining the appropriateness of activities: (1) the activity should have a secular purpose, (2) the activity should neither advance nor inhibit religion, and (3) the activity should have relevance to the curriculum. App. at 365.

On the issue of the "Treatment of Religion in the Curriculum," Policy 2270 permitted the "inclusion of religious literature, music, drama, dance and visual arts in the curriculum provided that it achieves specific goals of the written curriculum in the various fields of study; that it is presented objectively; and that it neither inhibits nor advances any religious point of view." App. at 365. It also permitted student-initiated expression of "religious belief or non-belief in compositions, works of art, music, speech and debate." App. at 365. Policy 2270 permitted the use of religious symbols only "to teach about historical or cultural context, not to promote or celebrate religious concepts, events or holidays." App. at 365.

As most relevant to this appeal, the section, "Treatment of Religious Holidays in Classrooms, School Buildings, Programs or Concerts," provided:

1. Religious holidays are not to be celebrated in the schools, except in the form of the secular nature of that holiday. However, opportunities to learn about cultural and religious traditions should be provided within the framework of the curriculum. Information about religious and cultural holidays and traditions, focusing on how and when they are celebrated, their origins and histories may be part of this instruction.

2. In planning school activities related to the teaching about religious holidays

or themes, special effort must be made to ensure the activity is not devotional and that pupils of all faiths and beliefs can join without feeling they are betraying their own faith or beliefs.

3. Decorations with religious significance are not permitted.

4. Religious music, like any other music, can only be used if it achieves specific goals of the music curriculum.

   a. Music programs prepared or presented by student groups as an outcome of the curriculum shall not have a religious orientation or focus on religious holidays.

App. at 366.

Prior to the 2004–2005 academic year, holiday music (Christmas and Hanukkah songs) were performed at the School District's December concerts. In the Fall of 2003, the mother of a School District student told her child's music teacher, William Cook, that she objected to her daughter playing the "Christmas Sing Along" at the December concert. App. at 77. Cook recounted this concern to Nicholas Santoro, the Director of Fine Arts, who passed the concerns on to James Memoli, the Assistant Superintendent.

In any event, the music repertoire of the December 2003 concert included "Star Spangled Banner," "Sounds of Hanukkah (a medley of 3 Hanukkah tunes)," "*Recuerdos de la Alhambra*," and the "Christmas Sing Along" which was a medley of "Joy to the World," "Silent Night," "Oh, Come All Ye Faithful," and "Hark the Herald Angels Sing."

After that concert, the objecting mother sent a letter to Peter Horoschak, the Superintendent of the School District, "express[ing her] concern that the School Board policy was not followed" because "point 4(a) [of Policy 2270] clearly states 'Music programs prepared or presented . . . shall not have a religious orientation or focus on religious holidays.'" App. at 181. The letter continued, "[a]s you know, the selection of music, both instrumental and vocal, had a clear religious orientation and focused on religious holidays." App. at 181–82. Horoschak responded, "[i]t was our judgment that because of the variety of both secular and 'holiday' (i.e., Hanukkah and Christmas) selections . . . there was not one particular focus on a particular religion or religious group, and, as such, there was no attempt to advance any religious point of view." App. at 183. However, he also noted that "concerns raised by parents regarding the holiday concert at South Orange Middle School suggest that the policy needs further clarification,"[1] and that Memoli and Santoro "are engaged in on-going discussions about such musical programs, and they will recommend to me suggested language for regulations which should clarify what types of programs and activities are permissible and not permissible under this policy." App. at 183.

On March 24, 2004, the School Board addressed the December concert issue at Horoschak's annual performance review, and, according to Horoschak's deposition testimony, the "board members had heard from some community members about instrumental music that . . . people felt represented a celebration of Christmas holidays and also there ha[d] been discussion about the fact that you really can't balance all religious groups in these representa-

---

1. The District Court noted that Horoschak "had a general recollection of parents' [sic] expressing similar concerns [about] the December concerts during the time period between 1998 and 2003, although he could not remember any specific instance other than one where a Muslim parent raised concerns that his/her faith was not represented during the concert." *Stratechuk,* 577 F.Supp.2d at 734–35 n. 1.

tions in these types of performances." App. at 166. The Board decided "that [Policy 2270] would be consistently implemented ... [so] that there wouldn't be so much discretion ... by every faculty member," and discussed drafting regulations to clarify the policy. *Stratechuk*, 577 F.Supp.2d at 735.

After meeting with relevant faculty and staff, Santoro issued a memo to the Department of Fine Arts, dated October 29, 2004 ("October 2004 Memo"). It stated that the "board policy, as it is written, will be implemented," and included the following bullet points:

[1.] All programs will be reviewed and approved by me....

[2.] We will avoid any selection which is considered to represent any religious holiday, be it Christmas, Hanukkah, etc. This holds true for any vocal or instrumental setting.

[3.] I would strongly suggest you gear towards the seasonal selections— Winter Wonderland, Frosty The Snowman, etc. Music centered on Peace is also a nice touch.

[4.] For the High School, the Brass Ensemble repertoire must also adhere to this policy, so the traditional carols must be eliminated from the repertoire.

[5.] The MKL [sic] Gospel Choir cannot perform at the CHS Holiday Assembly for the student body.

[6.] Your printed programs for any Holiday concert must avoid graphics which refer to the holidays, such as Christmas Trees and dreidels.

App. at 249.

In response to the October 2004 Memo, there were complaints from, inter alia, music teachers, parents, the South Orange Village President, and representatives of the MLK Gospel Choir. For example, seventeen members of the Maplewood community signed a "Petition Asking the Board of Education to Honor Religious Tolerance." App. at 250. Other complaints were more vigorous.

However, as Cook explained in his deposition testimony, Policy 2270 "didn't prohibit all religious music" in performances, only "music based on ... or themes consistent with pieces commonly associated with the holiday at the time of the holiday." App. at 92. Accordingly, Santoro approved the performance of Vivaldi's *Gloria in Excelsio (Cum sancto spiritu)* because "[t]he program does not have a religious orientation and it does not refer to a holiday...." App. at 370.

In addition, Policy 2270 and the October 2004 Memo were interpreted to prohibit only the performance of celebratory holiday music—not the teaching of such music in particular or of religious music in general. For example, Santoro testified that "[i]n performance [of the winter] concerts those selections [i.e., Joy to the World, Oh, Come All Ye Faithful, Hark, the Herald Angels Sing, and Silent Night] would not be allowed," although "[i]n the curriculum they would be allowed to be taught." App. at 133. He amplified that point in a letter to music teacher Barbara Eames stating that she could continue to "teach about the different holidays in ... music classes" because "[c]lassroom work is not a 'program,'" within the meaning of Policy 2270. App. at 369. Although Eames contended in a declaration to the District Court that the October 2004 Memo "has caused me to exclude certain music pieces that I would have used to achieve specific goals of the music curriculum" and "has caused me to censor my music curriculum ... in a way that I believe is harmful to [my students'] education and contrary to the goals of the music curriculum," App. at 391, she con-

ceded in her deposition testimony that "I haven't removed [Christmas or Chanukah songs] from my classroom curriculum because the policy does not do that," App. at 310.

The music performed at the 2004 December concert (approved by Santoro) included "Jingle Bell Rock," Vivaldi's "Gloria," "Winter Wonderland," *"Hava Nagila,"* "Madrigal of the Bells," "Rudolph the Red–Nosed Reindeer," and "Frosty the Snowman." Since 2004, songs with religious content have been performed at the December concerts; the 2005 concerts included *"Concerto VIII Fatto per la notte di natale,"* "Waters of Babylon (psalm 137)," *"Jubilate,"* and *"Agnus Dei/Cum Sanctis."*

On December 17, 2004, Stratechuk filed this action pursuant to 42 U.S.C. § 1983 in the United States District Court for the District of New Jersey (and later an amended complaint) naming as defendants the School District, its Board of Education, the Board President and Superintendent Peter P. Horoschak (together, "School District").[2] The Complaint alleged that during "the 2004/2005 school year … Defendants created, adopted, and implemented a strict policy of banning all religious music, including instrumentals, from the public schools in the district," such that "students … are no longer permitted to learn about, listen to, and participate in the presentation of traditional Christmas music during such curricular and co-curricular events as year-end holiday concerts, assemblies, and recitals." Complaint at ¶ 15. Stratechuk alleged that the School District's actions violated his and his minor children's rights under the Establishment Clause of the First Amendment by "convey[ing] the im-

permissible, government-sponsored message of disapproval of and hostility toward religion, including Christianity…." Complaint at ¶ 21. In addition, Stratechuk claimed that the same actions deprived him "and his minor children of their right to receive information and ideas, their right to learn, and their right to academic freedom, which are guaranteed under the First Amendment…." Amended Complaint at ¶ 24. Stratechuk sought (1) a declaratory judgment that his and his children's constitutional rights had been violated, (2) "a permanent injunction enjoining Defendants' policy, practice, and/or custom of banning religious music within the School District," (3) "damages for the past loss of his and his minor children's constitutional rights," and (4) attorneys' fees, costs and expenses. Amended Complaint at 7.

On October 10, 2005, *after* the period at issue in Stratechuk's complaint, the School District amended Policy 2270 by removing Section 4(a). *See* p. 4–5 *supra.* At the same time, in order to clarify Policy 2270 the School District adopted regulation R–2270, "Religion in the Schools," App. at 385, which provides that for children in grades 6–12, the "performance of music with religious text is appropriate when doing so is an outgrowth of the curriculum," but "musical performances shall not be celebrations of particular religious, ethnic or cultural holidays," App. at 386. For elementary school students, the performance of "music with a religious text shall be avoided." App. at 386. In addition, the section entitled "Celebration of Religious Holidays Prohibited" states that "[m]usical concerts or assemblies which take place during holiday seasons will not be 'holiday

---

**2.** In addition to stating that Stratechuk was the father of two minor children enrolled in the School District, the Complaint also noted that he was a music teacher at Hunter College in Manhattan, a professional violinist and conductor, and a Christian. Complaint ¶¶ 8–9.

concerts,' which celebrate religious, cultural or ethnic holidays." App. at 387. Stratechuk has not amended his complaint to include a challenge to this regulation or any of the School District's specific actions that occurred after he filed his amended complaint. The District Court, Appellees, and Amici correctly note that the schools have permitted the performance of music with religious content since 2004. *See Stratechuk*, 577 F.Supp.2d at 738; Appellee's Br. at 11–12; Amici's Br. at 10–11.

The District Court dismissed Stratechuk's complaint, finding that his claim relied on Policy 2270 alone and that he could not state a claim under that policy. *See Stratechuk v. Bd. of Educ. of S. Orange–Maplewood Sch. Dist.*, 200 Fed. Appx. 91, 93–94 (3d Cir.2006). This court vacated and remanded in a nonprecedential opinion, noting that the "policy that Stratechuk alleges was in place in 2004–2005 is decidedly different than the 'official policy' " articulated in the text of Policy 2270 and concluding that "a categorical ban on exclusively religious music," of the type that Stratechuk alleges, "appears to state a claim under the First Amendment." *Id.* at 94.

On remand, the parties engaged in discovery and both moved for summary judgment. The District Court granted summary judgment in favor of the School District, holding that Policy 2270, as interpreted by the October 2004 Memo (and as applied) did not violate the Establishment Clause or any First Amendment "right to receive information, ideas, right to learn, and right to academic freedom." *Stratechuk*, 577 F.Supp.2d at 749. Stratechuk timely appealed.

## II.

### Jurisdiction and Standard of Review

The District Court had jurisdiction over Stratechuk's § 1983 claim under 28 U.S.C. §§ 1331 and 1343(a)(3), and this court has jurisdiction under 28 U.S.C. § 1291.

This court "review[s] a grant or denial of summary judgment de novo, applying the same standard as the District Court." *Pichler v. UNITE*, 542 F.3d 380, 385 (3d Cir.2008). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In making this determination, we 'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.' " *Norfolk S. Ry. v. Basell USA, Inc.*, 512 F.3d 86, 91 (3d Cir.2008) (quoting *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir. 2001)).

## III.

### Discussion

### A. The Establishment Clause

Stratechuk launched a broad First Amendment attack against the School District's interpretation of Policy 2270, focusing in the first instance on the Establishment Clause. Under the Establishment Clause of the First Amendment,[3] "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court has read this clause to forbid not only "law respecting an establishment of a religion," U.S. Const. amend. I, but also "an official pur-

---

**3.** The Establishment Clause of the First Amendment, "of course, has long been held applicable to the States." *Wallace v. Jaffree*, 472 U.S. 38, 42 n. 10, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

pose to disapprove of a particular religion or of religion in general," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). "The touchstone for our [Establishment Clause] analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *McCreary County v. ACLU*, 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)).

■ Under the so-called *Lemon* test, a state law or governmental action violates the Establishment Clause if (1) it lacks a secular purpose, (2) "its principal or primary effect ... advances [ ]or inhibits religion," or (3) it "foster[s] an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (citation and quotation omitted). Although still good law, *see McCreary County*, 545 U.S. at 859–61, 125 S.Ct. 2722, some Justices have criticized the *Lemon* test, *see, e.g., Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring) ("Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again, frightening the little children and school attorneys...."). Without discarding the *Lemon* test, the Court has set forth two related tests, the "coercion test," *see Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), and the "endorsement test," *see Lynch v. Donnelly*, 465 U.S. 668, 687–94, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). The District Court analyzed Stratechuk's claim under

*Lemon*, concluding that the *Lemon* test was the most appropriate for the claim before it. Stratechuk argues that the School District's policy and conduct violates the Establishment Clause under both the *Lemon* test and the endorsement test.

**1. The *Lemon* Test**

■ "In applying the purpose [prong of the *Lemon*] test, it is appropriate to ask whether government's actual purpose is to endorse or disapprove of religion." *Wallace v. Jaffree*, 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (internal quotation omitted). "While [a court] is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham." *Edwards v. Aguillard*, 482 U.S. 578, 586–87, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). As such, "[t]he eyes that look to purpose belong to an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act." *McCreary County*, 545 U.S. at 862, 125 S.Ct. 2722 (internal quotations omitted).

■ Here, there is no religious purpose—only a secular one—so the issue is whether this secular purpose is actually, as Stratechuk maintains, a purpose to disapprove of religion. The School District argues, and the District Court found, that the purpose of the policy was to avoid government endorsement of religious holidays and a potential Establishment Clause violation. Although there are few opinions addressing this type of secular purpose, the District Court cited several courts of appeals' opinions where the courts held that "[a]ctions taken to avoid potential Establishment Clause violations have a secular purpose under the purpose prong of the *Lemon* test." *Stratechuk*, 577

F.Supp.2d at 743 (citing *Vasquez v. Los Angeles County,* 487 F.3d 1246, 1255 (9th Cir.2007) (holding that county's removal of the image of the cross from its official seal in order "to avoid a potential Establishment Clause violation [had a] valid secular purpose under *Lemon*"); *Roberts v. Madigan,* 921 F.2d 1047, 1054 (10th Cir.1990) (holding that school district's order directing teacher not to leave his bible in sight or read silently from it during classroom hours had a secular purpose in that it was intended "to assure that none of [the teacher's] classroom materials or conduct violated the Establishment Clause"); *cf. Borden v. Sch. Dist. of Twp. of E. Brunswick,* 523 F.3d 153, 174 (3d Cir.2008) ("The Supreme Court has stated that 'compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech.'") (quoting *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 761–62, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995))). Indeed, our own court has said as much. *Busch v. Marple Newtown Sch. Dist.,* 567 F.3d 89, 100 (3d Cir.2009).

Stratechuk maintains that this alleged purpose is a "sham" because the Establishment Clause does not require a prohibition on performing religious music and "[v]irtually every court that has been asked to review year-end holiday concerts or music programs that have included religious music or music associated with religious holidays has upheld them." Appellant's Reply Br. at 19–20. In support of this assertion, Stratechuk cites cases from the Eighth, Tenth, and Fifth Circuits that upheld the constitutionality of performing religious music in public schools. Appellant's Reply Br. at 20 (citing *Bauchman ex rel. Bauchman v. W. High Sch.,* 132 F.3d 542, 562 (10th Cir.1997) (upholding Utah school policy permitting music teacher to select explicitly Christian music and Christian religious sites for performance of school

choir); *Doe v. Duncanville Indep. Sch. Dist.,* 70 F.3d 402, 407–08 (5th Cir.1995) (upholding Texas high school's practices, such as permitting choir to use Christian religious song as its theme song); *Florey v. Sioux Falls Sch. Dist. 49–5,* 619 F.2d 1311, 1319 (8th Cir.1980) (upholding South Dakota school policy that permitted music "having religious themes or basis," including Christmas carols, as "part of the curriculum for school-sponsored activities and programs if presented in a prudent and objective manner. . . .")).

The cases cited by Stratechuk all upheld the policy of the respective schools or school districts. That is far different from holding that the First Amendment compels a school district to permit religious holiday music or risk running afoul of the First Amendment. Stratechuk has offered no persuasive authority that the First Amendment prevents South Orange–Maplewood School District from formulating a policy that precludes performance of religious holiday music.

Moreover, as the District Court noted, the assumption "that the Establishment Clause does not require the restrictions enacted by Defendants . . . does not automatically render Defendants' stated purpose a 'sham.'" *Stratechuk,* 577 F.Supp.2d at 744. In other words, even if performance of religious songs did not violate the Establishment Clause, it does not follow that the goals underlying the School District's desire to avoid a potential Establishment Clause violation were disingenuous or impermissible.

A similar issue was raised in *Bishop v. Aronov,* 926 F.2d 1066, 1077 (11th Cir. 1991). In that case, a University had placed certain limits on a professor's in-class comments regarding religion. The court upheld those limits under the *Lemon* test even assuming that the comments did

not violate the Establishment Clause. The court explained that "the restrictions neither advance nor inhibit religion—to the contrary, the University . . . simply attempted to maintain a neutral, secular classroom. . . ." *Id.*

As the District Court noted, the October 2004 Memo "was spurred by at least one parent's complaint," as well as the practical impossibility of including every religion in a December holiday concert. *Stratechuk,* 577 F.Supp.2d at 744. In fact, the concerns that led to the October 2004 Memo were the very type of concerns underlying the Establishment Clause jurisprudence in this area, i.e., the need for government neutrality towards religious institutions and beliefs, *McCreary County,* 545 U.S. at 860, 125 S.Ct. 2722, and the impressionability of young children, *Edwards,* 482 U.S. at 583–84, 107 S.Ct. 2573. In addition, as Amici note, "the Constitution does not require the School to promote religion to the constitutionally permitted maximum and its failure to do so does not make it anti-religious in any constitutionally significant way. School districts can determine how close to the 'Establishment Clause line' they wish to place themselves. . . ." Amici Br. at 33.

Moreover, as the School District points out, Stratechuk's argument that the purpose of the "current interpretation of Policy 2270 is to unconstitutionally disapprove of religion and, in particular, Christianity . . . is based largely upon plaintiff's inaccurate factual contention that defendants' policy amounts to a ban on religious music in the school system." Appellee's Br. at 37. To the contrary, it is clear that the policy, as interpreted, does not prevent—and the record shows that it has not in fact prevented—the teaching of religious holiday songs in the classroom or the performance of songs with religious content at the December concerts (albeit not songs specifically related to winter holidays).

It follows that the District Court did not err in holding that the School District's actions did not have an impermissible purpose within the meaning of *Lemon.*

■ Turning to the *Lemon* test's effect prong, which considers whether the "principal or primary effect" of the challenged policy or practice "advances [ ]or inhibits religion," *Lemon,* 403 U.S. at 613, we note Justice O'Connor's explanation that "[t]he effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval," *Lynch,* 465 U.S. at 690, 104 S.Ct. 1355 (O'Connor, J., concurring). "While an adjudication of [a policy's] effect must take into account the perspective of one who is neither Christian nor Jewish, as well as of those who adhere to either of these religions, the constitutionality of its effect must also be judged according to the standard of a 'reasonable observer.'" *County of Allegheny v. ACLU,* 492 U.S. 573, 620, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (opinion of Blackmun, J.). In a passage describing the endorsement test that is often quoted to describe the effects prong of the *Lemon* test, Justice O'Connor also noted that "the 'history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." *Id.* at 630, 109 S.Ct. 3086 (O'Connor, J., concurring).

Stratechuk argues that the " 'effect' of the School District's ban on the performance of religious music, irrespective of any alleged 'purpose,' conveys a message of disapproval of religion. . . ." Appellant's Br. at 44. For example, Stratechuk maintains that "[t]he reasonable observer would know that the MLK Gospel Choir was

permitted in the past to perform traditional Christmas religious music at the Columbia High School Holiday Assembly but has now been banned from performing at this event pursuant to the School District's new policy.... In the final analysis, an informed, reasonable observer would conclude that [the policy] has the effect of disfavoring religion...." Appellant's Br. at 46–47.

The District Court rejected this argument, concluding that "there is ample evidence available to the objective observer regarding the interpretation of Policy 2270 in the totality of the circumstances, which removes any claim that it conveys a message of disapproval of religion." *Stratechuk*, 577 F.Supp.2d at 746. To this effect, the Court noted that the policy permits the inclusion of "religious material when appropriate, provided that it is presented objectively and that it fits within the curriculum." *Id.* The Court also noted that the policy requires "[a]ccomodat[ion of] student-initiated expression[s] ... which reflect their beliefs or non-beliefs about religious themes...." *Id.* (internal quotation omitted). "Moreover, Policy 2270 allows for the use of religious music, provided it achieves specific goals of the music curriculum." *Id.* (internal quotation omitted).

Moreover, the District Court also noted that "[a]lthough the interpretation of Policy 2270 restricts the performance of holiday music during the December concerts, music teachers have indicated that they continue to teach those songs in the classroom ... and Director of Fine Arts Santoro has confirmed the appropriateness of this practice." *Id.* at 747.

Similarly, the District Court emphasized that songs with religious content have continued to be played at the December concerts since promulgation of the October 2004 Memo, as the policy "simply restricts the performance of holiday music at the time of the religious holiday that the music honors." *Id.* On this basis, the District Court had ample reason to conclude as follows: "Given the continued performance of religious songs and the continued teaching of holiday music in the classroom, the objective observer would not determine that the implementation of Policy 2270 ... sends a message of disapproval of religion." *Id.*

We note with approval the District Court's observation that the restriction on "the performance of holiday music, which changed earlier practices within the School District .... [did not] automatically convey a message of disapproval of religion because as the Supreme Court observed in *County of Allegheny*, '[a] secular state, it must be remembered, is not the same as an atheistic or antireligious state.'" *Id.* at 747–48 (quoting 492 U.S. at 610, 109 S.Ct. 3086). This point is elaborated in the Amici's brief which states that "Establishment Clause jurisprudence recognizes that neutrality towards religion is quite distinct from hostility towards it." Amici Br. at 17. The brief cites an Eleventh Circuit opinion that states that "[a] contrary conclusion would 'totally eviscerate the establishment clause.'" Amici Br. at 17 (quoting *Smith v. Bd. of Comm'rs*, 827 F.2d 684, 693 n. 9 (11th Cir.1987)). *Smith* also quoted a Ninth Circuit case, *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1536 (9th Cir.1985) (Canby, J., concurring), which stated that "distinctions must be drawn to recognize not simply 'religious' and 'anti-religious,' but 'nonreligious' governmental activity as well.'" As the Amici note:

> Were that not the case, almost every government action vis-a-vis religion would fall into one of two columns—pro- or anti-religion, promoting or hostile to—and be subject to Establishment

Clause attack in either event. That is the logic of Plaintiff's legal theory; indeed, that theory would, ironically, subject actions that sought to allow more religious content to that same black or white analysis.

Amici's Br. at 18. Numerous courts have rejected the suggestion that "secular" means "anti-religious." *See, e.g., County of Allegheny*, 492 U.S. at 610–11, 109 S.Ct. 3086; *Smith*, 827 F.2d at 693–94; *Grove*, 753 F.2d at 1536 (Canby, J., concurring).

We reject Stratechuk's argument that the fact that numerous students and parents have petitioned the school board and strongly urged it to reverse its policy "demonstrat[es] beyond genuine dispute that a reasonable observer could only perceive that the policy disfavors religion." Appellant's Br. at 26. The constitutionality of a school board's policy toward religion cannot be decided by reference to popular opinion. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 316–17, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (rejecting argument that school prayer policy was constitutional because it was approved by vote of the student body).

■■ The final prong of the *Lemon* test considers whether the challenged policy or practice "foster[s] an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105 (internal citation omitted). As now-Justice Alito wrote when he was a member of this court, an excessive entanglement "requires more than mere '[i]nteraction between church and state,' for some level of interaction has always been 'tolerated.'" *Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 534 (3d Cir.2004) (quoting *Agostini v. Felton*, 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)). In *Agostini*, the Supreme Court explained that the "factors employed 'to assess whether an entanglement is "excessive" are similar to the factors ... use[d] to examine "effect,"' ... Thus, we must look to 'the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.'" *Id.* at 534–35 (quoting *Agostini*, 521 U.S. at 232, 117 S.Ct. 1997).

Stratechuk argues that the School District's policy causes excessive entanglement because "school officials will be required to screen music to determine whether it is religious or secular in nature [and][d]rawing such distinctions between secular and religious themes will necessarily cause an entanglement with religion." Appellant's Br. at 48. The District Court acknowledged that the interpretation of the policy "involves some entanglement with religion" because the teachers must make selections with religious concerns in mind and because Santoro must approve these selections. *Stratechuk*, 577 F.Supp.2d at 748. However, the Court concluded that "[t]his type of oversight-this drawing of distinctions between secular and religious themes-strikes the Court as no different from the screening that school districts engage in every day to ensure neutrality in matters of religion." *Id.* at 749. The District Court also observed that "[t]o · conclude otherwise ignores the evidence and would undermine governmental efforts to comply with the Establishment Clause." *Id.* We agree, and conclude that when examined under the *Lemon* test, Policy 2270 does not contravene the Establishment Clause.

### B. The Endorsement Test

■ In light of the critique of the *Lemon* test, we also consider Stratechuk's claim that Policy 2270 fails the "endorsement test," a modification of the *Lemon* test. This test "dispenses with *Lemon*'s

'entanglement' prong and, combining an objective version of *Lemon*'s 'purpose' prong with its 'effect' prong, asks whether a reasonable observer familiar with the history and context of [a religious] display would perceive [it] as a government endorsement of religion." *Modrovich v. Allegheny County*, 385 F.3d 397, 401 (3d Cir.2004) (citing *Lynch*, 465 U.S. at 687, 104 S.Ct. 1355 (O'Connor, J., concurring)). In addition, "[t]he endorsement test asks whether the government action has 'the effect of communicating a message of government endorsement or disapproval of religion.'" *Id.* (quoting *Lynch*, 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring)).

The District Court held that this test did not apply because "this matter does not involve a religious display on government property or state participation in a religious activity." *Stratechuk*, 577 F.Supp.2d at 742 n. 8. There is merit to Stratechuk's argument that this court has not limited the endorsement test to cases involving religious displays on government property. *See, e.g., ACLU v. Black Horse Pike Reg'l Sch. Bd.*, 84 F.3d 1471, 1486–87 (3d Cir. 1996) (en banc) (applying endorsement test to challenge to student-led prayer at high school graduation).

As this court stated in that case, "[t]his endorsement test has at times been characterized as part and parcel of the *Lemon* test, and at other times as separate and apart from it. Whether 'the endorsement test' is part of the inquiry under *Lemon* or a separate inquiry apart from it, the import of the test is the same. We must determine whether, under the totality of the circumstances, the challenged practice conveys a message favoring or disfavoring religion." *Id.* at 1485–86. The result is the same under the endorsement test as under the effects prong of the *Lemon* test and our earlier conclusion that the School District's policy does not exhibit endorsement or hostility towards religion is equally applicable here.

## C. Additional First Amendment Claim

■ Stratechuk does not limit his First Amendment challenge to the Establishment Clause but also argues that the School District has violated his children's (and his) First Amendment rights by "seek[ing] to 'contract the spectrum of available knowledge' for its students by banning certain religious music from curricular and co-curricular activities and events simply because it is religious or associated with a religious holiday." Appellant's Br. at 51. We see no merit in this argument.

Stratechuk asserts that, through Policy 2270 as interpreted, "the government is seeking to remove an entire category of 'ideas' from the curriculum." Appellant's Br. at 50 n. 9. Presumably, Stratechuk equates "ideas" with religious celebratory music. Assuming without deciding the validity of this equation, Stratechuk's assertion is incorrect. There is no restriction of the students' access to the "ideas" to which he refers because the students have access to religious celebratory music in the classroom within the framework of the curriculum.

The District Court construed Stratechuk's argument as contending that Policy 2270 as interpreted violates his children's right to receive information and ideas. This led the District Court to an analysis of the Supreme Court's decisions in *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), and *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). The District Court noted that *Pico* dealt with the right to receive ideas

(the school board's decision to remove certain books from the school district's libraries) whereas *Kuhlmeier* dealt with the right to express ideas (censoring the student newspaper). The District Court stated that although *Pico* seemed on the surface more applicable to Policy 2270, it concluded that applying *Kuhlmeier* was more appropriate because the Supreme Court in that case addressed the issue as "whether the First Amendment requires a school affirmatively to promote particular student speech." 484 U.S. at 270–71, 108 S.Ct. 562. Because the *Kuhlmeier* Court held that the forum at issue in that case, the high school newspaper, was not a public forum, the school authorities had the discretion to "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562.

Using *Kuhlmeier* as precedent, the District Court in this case concluded that the December concerts are not public fora, and that the School District's interpretation of Policy 2270 is reasonably related to legitimate pedagogical concerns. On that basis the District Court granted the defendants' motion for summary judgment with respect to Stratechuk's First Amendment claim. We see no error of law or abuse of discretion in the District Court's analysis.

### IV.

#### Conclusion

We do not doubt Stratechuk's sincerity and commitment to the position he vigorously asserts in this litigation. But the overriding consideration for this court is that the School District administers public schools, and there are constitutional principles that govern the actions of public schools that do not limit private schools. Certainly, those of us who were educated in the public schools remember holiday celebrations replete with Christmas carols, and possibly even Chanukah songs, to which no objection had been raised. Since then, the governing principles have been examined and defined with more particularity. Many decisions about how to best create an inclusive environment in public schools, such as those at issue here, are left to the sound discretion of the school authorities. We see no constitutional violation in Policy 2270 or its application in this case.

We will therefore affirm the decision of the District Court.