**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-1819
_____

JANE DOE; JOHN DOE, individually and as parents and
next friend of, JORDAN DOE and JAMIE DOE


v.

INDIAN RIVER SCHOOL DISTRICT; INDIAN RIVER
SCHOOL BOARD; HARVEY L. WALLS; MARK A.
ISAACS; JOHN M. EVANS; RICHARD H. COHEE;
GREGORY A. HASTINGS; NINA LOU BUNTING;
CHARLES M. BIRELEY; DONALD G. HATTIER;
REGINALD L. HELMS; M. ELAINE MCCABE, and their
successors in office, in their official capacities as members of
the Indian River School Board,; LOIS M. HOBBS, and her
successors in office, in their official capacities as District
Superintendent,; EARL J. SAVAGE, and his successors in
office, in their official capacities as Assistant District
Superintendent

JANE DOE, JOHN DOE and JAMIE DOE,

Appellants

_____

On Appeal from the United States District Court for the
District of Delaware
District Court No. 1-05-cv-00120
District Judge: The Honorable Joseph J. Farnan, Jr.

Argued January 27, 2011

Before: FUENTES, CHAGARES, and ROTH, *Circuit Judges*

(Filed: August 5, 2011 )

Thomas J. Allingham II, Esq. (Argued)
Robert S. Saunders, Esq.
Timothy S. Kearns, Esq.
Skadden, Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19801

Brian G. Lenhard, Esq.
Lightning Bolt Softward, Inc.
8049 West Chester Pike
Upper Darby, PA 19082

Richard S. Horvath, Jr., Esq.
Four Embarcadero Center
Suite 3800
San Francisco, California

*Counsel for Appellants*

Jason P. Gosselin, Esq. (Argued)
Katherine L. Villanueva, Esq.
Michael Metz-Topodas, Esq.
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
            *Counsel for Appellees*

Ayesha N. Khan, Esq.
Michael A. Blank, Esq.
Americans United For Separation of Church and State
1301 K Street, N.W.
Suite 850, East Tower
Washington, District of Columbia
            *Amicus for Appellants*

Daniel Mach, Esq.
American Civil Liberties Union
915 15th Street, NW
Washington, District of Columbia
            *Amicus for Appellants*

Eric J. Rothschild, Esq.
Kristen H. Jones, Esq.
Shelly A. Solomon, Esq.
Michael J. Hartman, Esq.
Pepper Hamilton LLP
18th & Arch Streets
3000 Two Logan Square
Philadelphia, Pennsylvania
            *Amicus for Appellants*

Steven M. Freeman, Esq.
Steven C. Sheinberg, Esq.
Deborah Bensinger, Esq.
Anti-Defamation League
605 Third Avenue
New York, New York
            *Amicus for Appellants*

Roy S. Moore, Esq.
Benjamin D. DuPre, Esq.
John A. Eidsmoe, Esq.
Foundation for Moral Law
One Dexter Avenue
Montgomery, Alabama
            *Amicus for Appellees*

Steven W. Fitschen, Esq.
Wallbuilders, Inc.
The National Legal Foundation
2224 Virginia Beach Boulevard
Suite 204
Virginia Beach, Virginia
            *Amicus for Appellees*

Holly L. Carmichael, Esq.
5096 Selinda Way
Los Gatos, California
            *Amicus for Appellees*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

The Indian River School Board (the "Board") has a long-standing policy of praying at its regularly-scheduled meetings, which are routinely attended by students from the local school district. Appellants argue that the Board's policy is unconstitutional under the Establishment Clause of the First Amendment. The Board claims that a school board is like a legislative body and that its practice of opening board sessions with a prayer is akin to the practice that was upheld in Marsh v. Chambers, 463 U.S. 783 (1983). In Marsh, the Supreme Court held that Nebraska's practice of opening legislative sessions with a prayer was not a violation of the First Amendment's Establishment Clause. The issue in this case is whether a school board may claim the exception established for legislative bodies in Marsh, or whether the traditional Establishment Clause principles governing prayer in public schools apply. The District Court agreed with the Board's conclusion that its actions were constitutional under Marsh. For the reasons that follow, we will reverse.

## I.

### A. Procedural History

The complaint in this case was originally brought by two sets of plaintiffs who lived and sent their children to school in the Indian River School District (the "District"), located in southern Delaware. The first set of plaintiffs, Mona and Marco Dobrich, brought suit individually and on behalf of their son, a twelve-year old. Dobrich v. Walls, 380 F. Supp. 2d 366, 370 (D. Del. 2005). The Dobriches were

residents of the District. Their son had completed grades one through five in the district school. The second set of plaintiffs were Jane and John Doe, who also brought suit individually and as parents of Jordan and Jamie Doe. Id. At the time the Complaint was filed, Jamie Doe was a student at a District elementary school. Jordan Doe, who had previously attended middle school in the District but transferred to another school, planned on returning to a District high school. Id. at 371, 373.

Plaintiffs brought suit pursuant to 42 U.S.C. § 1983 against multiple defendants, including the Indian River School Board and the Indian River School District.[1] The Dobriches and the Does alleged violations of the First and Fourteenth Amendments of the Constitution stemming from various Board and District actions, including the Board's practice of opening its meetings with a prayer. Plaintiffs noted that students regularly attended these meetings and argued that the Board's prayer policy was therefore unconstitutional under the Establishment Clause. In addition, the Complaint challenged other allegedly unconstitutional practices:

> Plaintiffs allege that school sponsored prayer has pervaded the lives of teachers and students in the District schools. Plaintiffs allege that

---

[1] Plaintiffs also named as defendants the board members individually and the District Superintendent and Assistant Superintendent in their individual and official capacities. However, the suits against the parties in their individual capacities were later dismissed.

prayers have been recited at graduation ceremonies, athletic events, potluck dinners, ice cream socials, awards ceremonies, and other events. Plaintiffs also allege that District employees have led three different Bible Clubs, one for sixth grade students, one for seventh grade students and one for eighth grade students, and that students involved in these clubs have received "special privileges" like donuts and being able to head the lines to lunch. Plaintiffs further allege that at least one elementary school in the District distributed Bibles during the 2003 school year, and that religion has become part of the District's curriculum in that several teachers have referred to religion during their classes.

Id. at 371.

Plaintiffs sought various forms of relief, including compensatory and nominal damages, a declaratory judgment stating "that the customs, practices, and policies of the District with regard to prayer at School Board meetings and school functions are unconstitutional, both facially and as applied" and injunctive relief "banning Defendants from promoting, conducting, or permitting religious exercises or prayer at school functions, including but not limited to graduation ceremonies, athletic activities, holiday festivals, awards presentations and School Board meetings" and "requiring the District to distribute its school prayer policies publicly and to establish procedures for reviewing violations of the policy." Doe v. Indian River Sch. Dist., 685 F. Supp. 2d 524, 526 (D. Del. 2010).

7

In January 2008, the parties reached a partial settlement.[2]  With the exception of those relating to the Board's practice of beginning every School Board meeting with a prayer, the parties settled all of their claims.  The settlement was approved.  In March of 2008, the Dobriches moved out of the District and voluntarily dismissed the remainder of their claims, leaving only Jane and John Doe, individually and as the parents of Jordan and Jamie Doe, as plaintiffs in the case.  In April 2008, the Does and defendants submitted cross-motions for summary judgment on the issue of whether the Prayer Policy was constitutional.  The District Court granted summary judgment in favor of defendants.  It is this order that we now review.

## B.  The Prayer Policy

---

[2] At the motion to dismiss stage, the District Court dismissed the claims against the defendants in their individual capacities and held that some of the plaintiffs lacked standing to pursue some of the claims.  The court held that the Dobrich children lacked standing to pursue claims for prospective damages and declaratory and injunctive relief, Dobrich, 380 F. Supp. 2d at 373, but had standing to pursue claims based on past constitutional violations, id. at 374.  However, Marco Dobrich had standing to bring an action for damages and injunctive and declaratory relief as it pertained to the Board's Prayer Policy.  Id. at 374.  As for the Doe plaintiffs, they had "standing to seek injunctive and declaratory relief with respect to the alleged religious practices of the School District and School Board" for which they were personally present.  Id. at 373-74.

The heart of this case is, obviously, the prayer policy and practice of the Indian River School Board. The Indian River School District was created in 1969. Prayers have been recited at the meetings since that time. Although the Board prays at every public meeting, it does not pray at its closed-door or executive sessions. For thirty-five years, no written policy governed the Board's prayer practice. Then, in 2004, the Board decided to formalize this practice.

The Board's decision to write an official prayer policy was the result of a heated community debate about the propriety of prayer at local high school graduations and at School Board meetings. See Indian River, 685 F. Supp. 2d at 528-29. In June 2004, Mona Dobrich complained to the Board about the recitation of prayer at her daughter's high school graduation. Dobrich's complaint and the reaction it generated caused the Board to become concerned that it might be the subject of a lawsuit. Id. This led the Board to "solicit[] legal advice regarding the constitutionality of [its] practice of opening . . . regular meetings with a moment of prayer." Id. at 529. The Policy was drafted and presented to the Board's Policy Committee. In October 2004, the Board adopted the Policy by vote.

The resulting "Board Prayer at Regular Board Meetings Policy" ("the Policy"), reads as follows:

1.    In order to solemnify its proceedings, the Board of Education may choose to open its meetings with a prayer or a moment of silence, all in accord with the freedom

9

of conscience of the individual adult Board member.

2. On a rotating basis one individual adult Board member per meeting will be given the opportunity to offer a prayer or request a moment of silence. If the member chooses not to exercise this opportunity, the next member in rotation shall have the opportunity.

3. Such opportunity shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief.

4. Such prayer is voluntary, and it is among only the adult members of the Board. No school employee, student in attendance, or member of the community shall be required to participate in any such prayer or moment of silence.

5. Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual Board member, and his or her particular religious heritage.

JA 062.[3]

While the Policy formalizes the Board's decades-long practice of praying at public meetings, the practice surrounding the recitation of the prayer is essentially the same as it was prior to the enactment of the formal policy.

The Policy reflects the long-standing tradition of the Board of rotating the responsibility for reciting the prayer (or leading the moment of silence) among the board members that have volunteered for the role. The Policy states that the prayer is "voluntary" and "among only the adult members of the Board." JA 062. In practice, the Board President asks members to volunteer to lead the prayer or the moment of silence. The Board President is responsible for keeping track of which member gave a prayer and thus ensures that the opportunity is rotated between the volunteering members. A few days before the regularly-scheduled meeting, the Board President reminds the next person on the rotation that it is his or her turn to recite a prayer. When new members are elected, the Board President asks them to inform him if they wish to participate in the prayer rotation. The Policy also ensures that a prayer or moment of silence always occurs at the meetings, because "[i]f the member chooses not to exercise this opportunity, the next member in rotation shall have the opportunity." JA 062.

The Board meetings usually begin with a call to order and a roll call. This is followed by the presentation of the colors and delivery of the prayer. Since the official Prayer

---

[3] "JA" refers to the Joint Appendix.

11

Policy was enacted, it has become customary for a board member to offer a disclaimer between the presentation of the colors and the prayer. The purpose of the disclaimer is to "ensure that any members of the public in attendance understand the purpose of the prayer policy." Appellee Br. 11. Appellees offer the following, read on November 16, 2004, as an example of a typical disclaimer:

> It is the history and custom of this Board, that, in order to solemnize the School Board proceedings, that we begin with a moment of prayer, in accord with the freedom of conscience of the individual adult members of the Board. Further, such prayer is voluntary and just among the adult members of the School Board. No school employee, student in attendance or member of the community is required to participate in any such prayer or moment of silence.

JA 0349.

### C. Structure, Duties, and Practice of the Board

In support of their contention that the Board functions as a legislative body, the defendants direct our attention to the Board's composition, responsibilities, and power, which are set forth in Delaware law.

The Indian River School District serves the Delaware towns of Selbyville, Frankford, Dagsboro, Gumboro, Fenwick Island, Bethany Beach, Ocean View, Millsboro, and Georgetown. See 14 Del. C. § 1068. It is divided into five

12

electoral districts.  Id.  The District is made up of fourteen schools, employs 646 full-time teachers, and serves approximately 8,388 students.  Of these fourteen schools, there are "several elementary schools, two middle schools, two high schools, and an arts magnet school."  See Indian River, 685 F. Supp. 2d at 527.

Under Delaware law, a school district is "a clearly defined geographic subdivision of the State organized for the purpose of administering public education in that area."  14 Del. C. § 1002(5).  The Indian River School Board has "the authority to administer and to supervise the free public schools of the [Indian River School District]" and has "the authority to determine policy and adopt rules and regulations for the general administration and supervision of [said schools]."  Id. § 1043.  The Board is composed of ten members, who serve three-year terms.[4]  See id. § 1068(f). Two members are elected by the qualified electors of each district.  Id. § 1068(b), (g).  Board members are unpaid.  Id. § 1046.

Delaware law requires the Board to hold "regular meetings . . . each month during the year."  Id. § 1048(a). Special meetings may also be held "whenever the duties and

---

[4] At the time the District Court opinion was issued, the Board members were:  "Robert D. Wilson and Shelly R. Wilson (District 1); Patricia S. Oliphant and Vice President Kelly R. Willing (District 2); Randall L. Hughes II and Nina Lou Bunting (District 3); President Charles M. Bireley and Dr. Donald G. Hattier (District 4); and Donna M. Mitchell and Reginald L. Helms (District 5)."  Indian River, 685 F. Supp. 2d at 527.

13

business of the school board may require." Id. § 1048(b). The Indian River School Board holds its regularly-scheduled meetings on school property. The policy making responsibilities of the Board are extensive and touch nearly all aspects of a student's life. The Board must: (1) "[d]etermine the hours of daily school sessions; the holidays when district schools shall be closed; the days on which teachers attend educational improvement activities;" (2) set the educational policies for the school district; (3) "prescribe rules and regulations for the conduct and management of the schools;" (4) enforce school attendance requirements; (5) "[g]rade and standardize all the public schools under its jurisdiction and . . . establish kindergartens and playgrounds and such other types of schools; (6) "[a]dopt courses of study;" (7) "[s]elect, purchase, and distribute" textbooks and other school supplies, furniture, and equipment; (8) "[p]rovide forms" for employees to make reports to the school board; (9) submit required reports to the Secretary of Education; (10) "appoint personnel," id. § 1049; (11) provide for the care and repair of school property, id. § 1055; and (12) adopt rules governing use of school property and oversee requests for use of school property, id. § 1056.

The District also has the power to spend money for the "support, maintenance and operation of the free public schools." Id. § 1702. Although the District receives funding from the state general assembly, id. §1701, it is also empowered, through the Board, to levy and collect additional taxes for "school purposes." Id. §§ 1902, 1914.

The Board's minutes confirm that at its meetings it hears commentary, discusses, and votes on a wide variety of issues affecting local schools. For example, at any given

14

meeting, the Board may discuss curriculum development, changing the length of the school day, capital improvements, increases or reductions in staffing, and financial matters. The minutes also disclose that students regularly attend the Board meetings. While the number of students attending the Board meetings fluctuates during the year, at least some students attend nearly all of the meetings held during the school year. Board President Charles M. Bireley—who, with the exception of a two-year period, has sat on the board continuously since 1974—estimated that at certain meetings there may be 50 students in attendance while at others there are "very few." JA 389. In his calculation, on average "a couple of dozen" students attend each meeting. Id.

Generally speaking, there are six reasons why a District student might attend a Board meeting. First, students facing disciplinary action for serious offenses are permitted to speak with the Board directly in connection with their situation. The Board deals with student disciplinary actions at the closed-door portion of its public meetings.

Second, students belonging to one of the two Junior Reserve Officers' Training Corps ("JROTC") programs at the local high schools attend every meeting to perform the "presentation of the colors." This tradition started sometime in 2000, when the JROTC programs at Sussex Central and Indian River High Schools were created. Typically, the principal of the school where the meeting is being held will inform the ROTC students of the location and date of the next meeting.

Third, students attend the School Board meetings in their formal role as student government representatives.

15

Sometime between 1993 and 1995, then-Board Member Richard Cohee submitted a motion to make presentations from student government representatives an official part of the meetings. The motion passed; the Board now regularly devotes a section of its agenda to presentations from student government leaders and their comments are reflected in the minutes. The usual practice is for a representative from each of the two high schools in the district to attend the meetings. The Board President will "invite the student government representatives to come forward to speak." JA 395. During the school year, student government representatives address the Board at "most meetings." JA 395. However, there "ha[ve] been meetings when [the Board] did not hear from the [student government] representative." JA 500.

Fourth, students also attend the meeting to perform a piece of music or theatre for the Board's benefit. These performances are a regular feature of the meetings.

Fifth, the Board meetings are routinely used to recognize individual or team achievement. It is for this purpose that the greatest numbers of students attend the meetings. At the meeting, the student's name will be called out and he or she will be presented with a letter signed by the Superintendant and the Board President commemorating his or her accomplishment. Photographs are also taken, which may be published in the local newspaper. The Board then records each student by name in the minutes, which are posted on the school district website. Prior to 1994, these types of awards were given out at student assemblies.

The record contains countless examples of these types of awards. The Board has recognized a broad array of student

16

activities, including Odyssey of the Mind tournament winners, art contest winners, scholarship recipients, all-state sports teams, JA 271, other athletic achievements, and musical achievements. These awards are such an important part of student life that Board President Bireley was not aware of any instance where a student declined to attend the meeting to receive an award, other than for a scheduling conflict. In fact, the awards portion of the Board meeting has become so lengthy that the Board has received complaints from its members about the excessive time spent on this portion of the meeting. There has been informal discussion about limiting the number of awards given out or eliminating this portion altogether in order to decrease the meeting time.

Finally, every Board meeting concludes with a public comments section that students may also attend. This portion of the meeting provides members of the community with an opportunity to "come and talk to [the Board] about things that [are] on their minds, concerns, or anything like that or have input." JA 394.

### D. The Content of the Prayers

It is in this environment that the School Board delivers its prayers. The Policy places several limits on the prayers that are recited.[5] By its terms, it permits a wide range of prayers—they "may be sectarian or non-sectarian, denominational or non-denominational" and may refer to specific religious entities by name. JA 0062. However, the

---

[5] These limitations, of course, also apply to the moments of silence, although in practice they are obviously aimed at regulating spoken prayer.

17

prayer may "not be used or exploited to proselytize, advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief." JA 0062.

While by its terms the Policy permits nearly any type of prayer, the record shows that the prayers recited at the meetings nearly always—and exclusively—refer to Christian concepts. The record contains several examples of prayers given by different Board Members. On February 22, 2005, Board Member Helms recited the following prayer: "Heavenly Father, Lord our God. Heavenly Father, please help the Board with the problems in the School District that we are going through right now. We ask these things in Jesus' Name." Indian River, 685 F. Supp. 2d at 530. In June 2006, a Board Member offered the following prayer:

> Dear Heavenly Father, among Your many blessings, we thank You for the beautiful summer weather and especially for the much needed rain. We thank You also for the wonderful school year that has just ended with so many successes, awards, and accomplishments of our students and staff once again. We ask Your continued blessings on those among us who have devoted so much time, energy, and expertise to the betterment of this district and who are now stepping down. Given [sic] them peace, health, and happiness in the days to come. Be with our people who have suffered illness or injury this year, and grant them a quick return to normal life. Comfort the families of those who are lost to us and give them strength in their time of grief. Protect all

18

who are here and return them to us safely in the fall. We ask that You continue to guide and direct us in . . . our decision-making, so that every child in this district receives the educational skills to be all he/she can be. We ask these things and all others in the name of Jesus Christ, our Lord. Amen.

Id. at 547 (ellipsis in original).

As the District Court found, "[i]t is undisputed that some Board members choose to invoke the name 'Jesus,' 'Jesus Christ,' 'Heavenly Father,' or 'Lord our God' during their prayers." Id. at 530. This is confirmed by testimony from the Board's members. In his deposition, Bireley stated that, in the nearly thirty years he had been on the Board, he could not recall a time when three of the current Board Members regularly responsible for the prayer had given a prayer that failed to invoke the name of Jesus Christ. Similarly, Board Member Cohee, who sat on the board from 1993 through approximately 2004 "testified that the 'majority' of Board prayers have been 'Christian'" during his service. Indian River, 685 F. Supp. 2d at 541. He acknowledged that during his time he could not recall a spoken prayer being given that did not refer to "[a] religious deity other than Jesus or the Christian God." JA 519.

At the time of the original litigation, the responsibility for reciting the prayer alternated between Board Members Reginald Helms, Nina Lou Bunting, Donald Hattier, and Donna Mitchell. Helms testified that he was responsible for six of the prayers in the fifteen Board meetings held between July 2005 and October 16, 2006, and at all six meetings he

19

"pray[ed] in the name of Jesus Christ," JA 780. During her deposition, Bunting explained, "I could not give what I would call a non-sectarian prayer, because I would have to mention Jesus Christ in my prayer, and I would consider that a sectarian prayer. So if I gave a prayer it would have to be sectarian and not non-sectarian." JA 469. Dr. Hattier did not present any testimony of the type of prayer that he typically offers except to suggest that they are usually "historical." JA 656.

The record contains two examples of "historical" prayers recited by Board Members. At the public Board meeting that took place on March 22, 2005, Board Member Walls recited a prayer from a speech given by Martin Luther King:

> God does not judge us by the separate incidences or the separate mistakes that we make, but by the total bent of our lives. In the final analysis, God knows that his children are weak and they are frail. In the final analysis what God requires is that your heart is right.

JA 364. Board Member Walls followed this with a brief statement of the prayer's significance:

> As we gather here this evening, let us take these words to heart and put the best interests of the students, teachers, employees and residents of the Indian River School District ahead of our own. Amen.

20

JA 364. On August 24, 2004, at the heated public meeting about the role of prayer in the District's schools, Board Member Hattier recited a historical prayer described by the District Court as a "prayer composed by George Washington and contained in a 1783 letter to the Governors of the newly-freed states." Indian River, 685 F. Supp. 2d at 529.

While the Policy permits moments of silence to be offered in place of a spoken prayer, this appears to happen infrequently. In the thirty-six Board meetings held between October 2004 to October 2007, "[three] opened with a moment of silence." Id. at 530-31.

## II.

Tasked with deciding the constitutionality of this Policy, the District Court was first obliged to tackle the threshold question of what legal framework to employ. The parties presented two possibilities. Defendants argued that the Indian River School Board's Policy was constitutional under the legislative prayer exception set forth in Marsh v. Chambers, 463 U.S. 783 (1983), while plaintiffs maintained that the Supreme Court's school prayer jurisprudence provided a more suitable framework, citing specifically to Lee v. Weisman, 505 U.S. 577, 592 (1992). Several elements of the School Board's actions took it outside the purview of Marsh, plaintiffs argued: the attendance and participation of children in the Indian River School Board meetings, the Board's essential role in public school education, the Board's history of promoting sectarian prayer, and Marsh's unique historical context. Plaintiffs' argument would have required the District Court to forego the special allowance for legislative bodies and examine the constitutionality of the

21

Policy under "other Establishment Clause tests-*i.e.*, the Lemon test, the 'endorsement' test or the 'coercion' test." Indian River, 685 F. Supp. 2d at 536.

Faced with these two choices, the District Court "ha[d] little trouble concluding that the School District qualified as the type of 'deliberative body' contemplated by Marsh." 685 F. Supp. 2d at 537. In concluding that the legislative prayer exception applied, the court cited the following facts: (1) the Board is created by statute; (2) Board Members are popularly elected; (3) the Board's duties include "setting educational policies . . . hiring and firing administrators and teachers, creating and approving curriculum, administering the District's budget;" (4) the Board holds public meetings to vote on these issues; and (5) members of the community attend Board meetings to "express their views and concerns." Id. The District Court rejected plaintiffs' argument that because the Board lacked authority to pass laws or levy taxes without a public referendum, it was not a "legislative body." Id. The court explained that Marsh did not hinge on the "level of government in which a legislative or deliberative body falls or . . . the differences in the power and responsibilities such bodies exercise." Id. In support, the court drew attention to cases where Marsh was applied beyond its traditional context, including a county commission, see Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1276 (11th Cir. 2008), county board of supervisors, see Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276, 278 (4th Cir. 2005), and a city council, see Snyder v. Murray City Corp.*, 159 F.3d 1227, 1228 (10th Cir. 1998).

Plaintiffs also advanced the argument that Marsh was inapplicable because "public schools and public school

boards were 'virtually nonexistent at the time the Constitution was adopted.'" Indian River, 685 F. Supp. 2d at 537 & n.107 (quoting Edwards v. Aguillard, 482 U.S. 578, 583 n.4 (1987)). The District Court rejected that argument, noting that there was no support for the proposition that the prayer exception was limited to the types of legislative bodies in existence at the time that the First Amendment was adopted. Id. at 537-38.

The District Court next addressed plaintiffs' contention that the relationship between the public school system and school boards rendered Marsh inapplicable. None of the features plaintiffs identified were particularly persuasive to the court. First, school board meetings are not "akin to a classroom setting or a graduation ceremony." Id. at 538-39. In the former, "attendance is involuntary and students are under the exclusive control of school personnel." Id. at 539. A board meeting is also dissimilar from a school graduation, because graduations were "the one school event most important for the student to attend" and one where "the 'influence and force' exercised over the students by the school personnel is 'far greater.'" Id. at 539 (quoting Lee, 505 U.S. at 591). Second, board meetings are not analogous to school extracurricular activities, because the former are "part of a complete educational experience" and "important to many students." Id. (internal quotation marks omitted). Attending a board meeting, on the other hand, is "at best incidental to a student's public school experience." Id. "In sum, a school board meeting does not implicate the same concerns as the coercive effect of classroom prayers, graduation prayers, or prayers during extracurricular activities." Id.

In reaching this conclusion, the District Court distinguished the present case from the only other Court of Appeals decision to have tackled the question of whether a school board's prayer are subject to Marsh, Coles v. Cleveland Board of Education, 171 F.3d 369 (6th Cir. 1999). In Coles, the Sixth Circuit found in similar circumstances that school boards were distinct from legislative bodies, and thus board prayers should be analyzed under the school prayer case law, *i.e.* Lee, not Marsh. 171 F.3d at 379. The District Court was not persuaded by the Sixth Circuit's reasoning: "it strains credulity to equate a School Board meeting with a public school classroom" and "no Supreme Court precedent supports the proposition that the same concerns that apply in school settings . . . also apply in every 'public school setting.'" Indian River, 685 F. Supp. 2d at 539 n.120. The court seized on Coles's reference to "public school settings," which it warned could be used to invalidate prayer at "a teacher's conference in the evening or during the week," a "PTA supper in the school gym," or "any other activity conducted on school property." Id. (citing Coles, 171 F.3d at 387 (Ryan, J. dissenting)).

Nor did the "frequent[] attend[ance]" of students at the board meetings or the fact that "students may feel disinclined to leave during an opening prayer" render Marsh inapplicable, the court explained. Id. at 540. The court acknowledged Jane Doe's testimony that she felt "peer pressure to bow her head" which made her "feel uncomfortable and excluded." Id. (internal quotation marks omitted). While noting that it was "not insensitive to these concerns," id., the court nonetheless dismissed them. Other than Jane Doe's testimony, there was "no evidence [in the record] that any student has felt coerced or pressured to participate in a prayer given during a public

24

Board meeting." Id. The court also drew attention to the perceived risk of finding that the presence of students at a legislative prayer invalidated the practice: "[S]tudents across this country attend legislative sessions, including sessions of the United States Senate and House of Representatives, for similar purposes, including field trips, presentation of the colors, and to be recognized for their accomplishments. If the mere presence of school children were enough to invalidate prayers in legislative and other deliberate bodies, such practices would be unconstitutional in virtually every setting." Id.

Having decided that Marsh applied, the District Court then tackled the question of whether the prayers were constitutional under that precedent. It ultimately found that "Marsh did not intend to authorize only nonsectarian" prayer, and thus the *content* of the Board's prayers was not dispositive. Id. at 541-42. Nevertheless, the court took issue with the plaintiffs' characterization of the prayers as "overwhelmingly sectarian." Id. at 540-41. At most, the court explained, "the Board Members often reference Jesus Christ in their prayer." Id. Moreover, references to religious figures, including "God" and "Jesus Christ" do not necessarily render a prayer "sectarian," because "[a]ny prayer has a religious component." Id. at 542 (internal quotation omitted). The District Court also rejected plaintiffs' argument that the Prayer Policy was unconstitutional under Marsh because it "advances" Christianity and has been used to "proselytize." Id. at 543. The court disagreed, explaining that "the brief references to Jesus Christ in [some of the] prayers" did not "transform those prayers into an impermissible attempt to proselytize or advance Christianity." Id. at 544. In addition, several features of the Policy ensured

25

the Board did not stray into constitutionally dubious territory: (1) the policy explicitly prohibits prayers that proselytize or advance Christianity; (2) the Policy explicitly permits non-sectarian prayer; (3) responsibility for the prayer is rotated among Board Members; and (4) certain Board Members choose to lead a moment of silence rather than pray.

While recognizing the fact that the Board Members themselves had the responsibility of monitoring and enforcing compliance with the Prayer Policy was an "entanglement problem" that "would be cognizable" under the Supreme Court's school prayer jurisprudence, the District Court concluded that the Policy "d[id] not run afoul of Marsh." Id. at 544-45. Similarly, the fact that the board members themselves gave the prayers did not render the Policy unconstitutional. Citing to Snyder, 159 F.3d at 1233, the court noted that Marsh is not violated simply because the government "chooses [a] particular person" to give that prayer. Indian River, 685 F. Supp. 2d at 549. Moreover, in this case, the Indian River Policy was even *more* inclusive than the practice in Marsh, because here the "unpaid, popularly elected members" rotated the prayer opportunity among themselves without regard to the Board Members' religious beliefs. Id. at 549-50. Finally, the District Court rejected plaintiffs' various arguments that the school board had an impermissible motive in adopting the Policy, finding that the evidence in the record did not support that assertion.

The District Court thus granted summary judgment in favor of defendants and denied plaintiffs' motion for

summary judgment. Plaintiffs timely filed this notice of appeal.[6]

## III.

### A. The Establishment Clause

Our starting point, naturally, is the Establishment Clause of the First Amendment. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." Const. amend. I. The Establishment Clause was "designed as a specific bulwark against [the] potential abuses of governmental power." Flast v. Cohen, 392 U.S. 83, 104 (1968). It therefore prohibits the government from "promot[ing] or affiliat[ing] itself with any religious doctrine or organization, . . . discriminat[ing] among persons on the basis of their religious beliefs and practices, . . . delegat[ing] a governmental power to a religious institution, and . . . involv[ing] itself too deeply in such an institution's affairs." Cnty of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 590-91 (1989). The Clause "applies equally to the states, including public school systems, through the Fourteenth Amendment." Borden v. Sch. Dist. of Twp. East Brunswick, 523 F.3d 153, 175 (3d Cir. 2008) (citing Wallace v. Jaffree, 472 U.S. 38, 49-50 (1985)).

---

[6] We have jurisdiction over an appeal from a final decision of the District Court pursuant to 28 U.S.C. § 1291. The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

The Supreme Court's Establishment Clause jurisprudence is vast and comprised of interlocking lines of cases applying the Clause in particular situations. However, at the very least, the Court has ascribed to the First Amendment the following general meaning:

> Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

Everson v. Bd. of Ed. of Ewing Twp., 330 U.S. 1, 15-16 (1947). In the present case, we focus only on two lines of Establishment Clause jurisprudence—the cases governing prayer in the public school system and the legislative prayer exception stated in Marsh.

### 1. The School Prayer Cases

The Supreme Court first tackled the question of school prayer in Engel v. Vitale, 370 U.S. 421 (1962). In that case, New York State implemented a regulation requiring school officials to recite a prayer aloud at the start of every day. Id. at 423. The prayer, which was composed by state officials, read in its entirety: "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country." Id. at 422. The Supreme Court held that the practice of "using [the] public school system to encourage recitation of the Regents' prayer" was "wholly inconsistent with the Establishment Clause." Id. at 424. It reasoned that the prayer amounted to "religious activity" and served to "officially establish" the beliefs professed therein. Id. 424, 430. The Court warned that "it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government." Id. at 425. That the prayer was "nondenominational" or permitted students to remain silent or leave the classroom during the prayer did not cure its constitutional defects. This is because the Establishment Clause is violated by "enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not." Id. at 430.

The next year, in School District of Abington Township, Pennsylvania v. Schempp, 374 U.S. 203 (1963), the Supreme Court again invalidated two state policies of prayer in public schools: a Pennsylvania law requiring "[a]t least ten verses from the Holy Bible [to] be read, without comment at the opening of each public school on each school day," id. at 205, and a policy adopted by the Board of School Commissioners of Baltimore, Maryland, that called for every

29

school day to open with a reading "of a chapter in the Holy Bible and/or the use of the Lord's Prayer," id. at 211. In both cases, children could be excused from participating or observing the prayer. Id. at 207, 211 n.4.

Neither practice withstood the Supreme Court's scrutiny. Three aspects of the states' policies rendered them unconstitutional: the fact that the state was "requiring the selection and reading at the opening of the school day of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison," the fact that the practice was "prescribed as part of the curricular activities of students who are required by law to attend school," and finally, that the prayer was recited "in the school buildings under the supervision and with the participation of teachers employed in those schools." Id. at 223. Citing Engel, the Court explained that the fact that students could absent themselves from the prayer did not remedy the policy's unconstitutionality. Id. at 225.

By the time the Court decided its next school prayer case, Wallace v. Jaffree, 472 U.S. 38 (1985), it had already announced the well-known "Lemon test" as the standard for determining the constitutionality of state action under the Establishment Clause. In Lemon v. Kurtzman, the Court identified three factors that assist it in determining whether government action violates the Establishment Clause: (1) whether the government practice had a secular purpose; (2) whether its principal or primary effect advanced or inhibited religion; and (3) whether it created an excessive entanglement of the government with religion. 403 U.S. 602, 612-13 (1971). Applying those factors, the Wallace Court held that an Alabama statute authorizing "a period of silence for

30

'meditation or voluntary prayer,'" in public schools, 472 U.S. at 41, was unconstitutional. Specifically, the Supreme Court found that the statute failed the "purpose prong" of the Lemon test: the evidence of legislative intent revealed that the explicit purpose of the statute was to return voluntary prayer to schools. Id. 57-60.

The key case in this series—and the one plaintiffs primarily rely on—is Lee v. Weisman, supra. In Lee, the Supreme Court held that a Rhode Island policy of permitting principals to choose clergymen to give nonsectarian prayers at school graduations was unconstitutional. The Court identified several aspects of the state's control over the prayer that were constitutionally problematic: First, because "[a] school official, the principal decided that an invocation and a benediction should be given; . . . . from a constitutional perspective it is as if a state statute decreed that the prayers must occur." 505 U.S. at 587. Second, the principal chose *who* should give a prayer, a "choice [that] is also attributable to the State . . . [that has] the potential for divisiveness." Id. Third, because the principal provided the selected clergyman with guidelines for the prayer, the state "directed and controlled the content of the prayers." Id. at 588. In effect, the government itself composed the prayer, a fact completely incompatible with the Establishment Clause. Id. Fourth, school officials' "effort to monitor prayer w[ould] be perceived by the students as inducing a participation they might otherwise reject." Id. at 590. In sum, "[t]he degree of school involvement here made it clear that the graduation prayers bore the imprint of the State and thus put school-age children who objected in an untenable position." Id.

The Lee Court wrote at length about the "heightened concerns," regarding prayers in the public school educational system, which "carry a particular risk of indirect coercion." Id. at 592. Although that concern exists outside of the context of schools, "it is most pronounced there." Id. Thus, courts must be careful to "protect[] freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." Id. In emphasizing the special nature of the school context, the Court compared the case to Marsh: "Inherent differences between the public school system and a session of a state legislature distinguish this case from [Marsh v. Chambers]." Id. at 596. First, "[t]he atmosphere at the opening of a session of a state legislature where adults are free to enter and leave with little comment and for any number of reasons cannot compare with the constraining potential of the one school event most important for the student to attend." Id. at 597. Second, a school graduation has "far greater" "influence and force" than the "prayer exercise we condoned in Marsh." Id. At a high school graduation, where school administrations "retain a high degree of control over the precise contents of the program, the speeches, the timing, the movements, the dress, and the decorum of the students," the school's involvement in the invocation and benediction "combine to make the prayer a state-sanctioned religious exercise in which the student was left with no alternative but to submit." Id. This, too, distinguished Marsh from Lee.

The Court again rejected the argument that the prayer was constitutional because students had the choice to stand silently during the benediction or refuse to attend the graduation altogether. Although the pressure to "stand as a group" during the invocation might be "subtle and indirect,"

32

it was "as real as any overt compulsion." Id. at 593. The Court acknowledged that although standing silently might be interpreted as a personal act of dissent, the "reasonable perception" would be that any student standing or remaining silent during the prayer was *participating* in the prayer. Id. In support, Lee drew from research showing that "adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention." Id. at 593-94.

Of course, a student could always *choose* to absent herself from the graduation ceremony altogether. But this "choice" was no choice at all. While the parties had stipulated that attendance at the graduation was "voluntary," the Court disagreed with this characterization. "[T]o say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme." Id. at 595. "Law reaches past formalism." Id. Graduations have significant personal and cultural meaning; they are an opportunity for the student and her family to "celebrate success and express mutual wishes of gratitude and respect." Id. To require a student to absent herself from her graduation in order to express her disapproval of the school prayer policy would contradict the First Amendment. This is because "the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resist[ance.]" Id. at 596.

The "heightened concerns" attendant to students more recently led the Supreme Court to strike down school policies permitting prayer at events where attendance is even more "voluntary." Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290 (2000). In Santa Fe, the Court tackled the question of whether student-led and student-initiated invocations

authorized by school policy that were given prior to a football game violated the Establishment Clause. Id. at 294. Under that policy, the senior class elected the students responsible for delivering a "brief invocation and/or message," the purpose of which was to "solemnize" the "home varsity football games." Id. at 296-97 & n.6.

With the principles of Lee in mind, id. at 301-02, the Court found that, despite student involvement in selecting and composing the invocation, the state was in fact extensively "entangled" in this religious activity, id. at 305-08. The school had crafted the policy permitting student prayer and thus was responsible for selection of the speakers and their messages; the prayer was delivered "as part of a regularly scheduled, school-sponsored function conducted on school property" and "the message [wa]s broadcast over the school's public address system, which remain[ed] subject to the control of school officials" and the prayers took place at football games replete with school symbols. Id. at 307.

The Supreme Court also rejected the school's argument that Lee's warnings about the coercive aspects of school graduations were absent in extracurricular events like football games. While accepting the proposition that attendance at a football game was in some ways more voluntary than attendance at a high school graduation, the Court noted that for some students—the players, cheerleaders, band members—attendance was essentially mandatory. For others, football games were important "traditional gatherings." Id. at 312. Citing Lee, 505 U.S. at 596, Justice Stevens reiterated that the First Amendment does not permit the school to "force" students to make the "difficult choice"

34

between "attending these games and avoiding personally offensive religious rituals." 530 U.S. at 312.

## 2. The Legislative Prayer Exception in <u>Marsh</u>

In <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983), the Supreme Court addressed the constitutionality of the Nebraska legislature's practice of opening each session with a prayer given by a chaplain who was paid with public funds. <u>Marsh</u> is atypical within the Establishment Clause jurisprudence in that the Supreme Court did not employ its usual Establishment Clause "tests" to analyze the contested state practice. Rather, the Court's decision, which found that the practice was constitutional, is premised on the long history of prayer by legislative and deliberative bodies in the United States.

Writing for the Court, Justice Burger set forth that history:

> The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom. . . .

> The tradition in many of the colonies was, of course, linked to an established church, but the Continental Congress, beginning in 1774, adopted the traditional procedure of opening its

35

> sessions with a prayer offered by a paid chaplain.

Marsh, 463 U.S. at 787 (internal citations omitted). Marsh paid particular attention to the timing of the enactment of the Bill of Rights, which played a pivotal role in the Court's reasoning. The Court observed that while "prayers were not offered during the Constitutional Convention, the First Congress, as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer." Id. at 787-88. This led the Senate to create a committee to appoint a suitable chaplain on April 7, 1789. Id. at 788. On April 9, 1789, the House of Representatives created a similar committee. Id. The Senate elected its first chaplain on April 25, 1789, while the House did the same a few days later on May 1, 1789. Id. On September 22, 1789, a statute providing for the payment of these chaplains was enacted. Id. A mere three days after Congress authorized payment for the chaplains, "final agreement was reached on the language of the Bill of Rights." Id.

The Supreme Court ascribed to this chronology great significance, explaining that this series of events "shed[] light . . . on how [the draftsmen] thought that [the Establishment] Clause applied to the practice" of legislative prayer. Id. at 790. The fact that the First Amendment was written only days after the Senate had authorized payment for the chaplains suggested to the Court that legislative prayer did not offend the First Amendment. The history was evidence of the following:

> Clearly, the men who wrote the First Amendment Religion Clause did not view paid

36

legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of congress.

. . .

It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a Chaplain for each House and also voted to approve the draft of the First Amendment for submission to the States, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable.

Id. at 788, 790. Given this "unambiguous and unbroken history of more than 200 years" of Congressional prayer, the Court explained, "there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society." Id. at 792. Nebraska's century-old practice of legislative prayer was "consistent with two centuries of national practice" and thus would not "be cast aside." Id. at 790. However, the Court did not define a "legislative" or "deliberative" body anywhere in its opinion.

The second issue in Marsh was whether the specific prayers offered by the Nebraska Legislature violated the Establishment Clause. The Court found that they did not, again drawing from the history of legislative prayer in the First Congress. The Court identified three potentially problematic aspects of the Nebraskan prayer practice: (1) the prayers were given by "a clergyman of only one denomination-Presbyterian-[who] has been selected for 16

37

years;" (2) "the chaplain is paid at public expense;" and (3) "the prayers are in the Judeo-Christian tradition." Id. at 793.

None of these factors, considered against the "unique history" of legislative prayers, rendered the Nebraska practice unconstitutional. Id. Again, the Court explained that at the First Congress, "delegates did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one religious view." Id. at 792 (internal quotation marks and citation omitted). Moreover, there was no evidence that the chaplain's long tenure "stemmed from an impermissible motive" and thus his reappointment did "not in itself conflict with the Establishment Clause." Id. at 793-94. That the chaplain was paid from public funds was similarly "grounded in historic practice" and thus not unconstitutional. Id. at 794. The content of the prayer was "not of concern" because "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." Id. at 794-95. In sum, the prayers were "simply a tolerable acknowledgment of beliefs widely held among the people of this country." Id. at 792.

## B. Application to the Indian River School Board

In light of this jurisprudential background, we must determine whether our analysis of the Indian River School Board's Prayer Policy is guided by the principles endorsed in Lee v. Weisman or by the exception established in Marsh v. Chambers. For the reasons below, we conclude that Marsh's

legislative prayer exception does not apply and find that <u>Lee</u> provides a better framework for our analysis.[7]

Lee and the Supreme Court's other school prayer cases reveal that the need to protect students from government coercion in the form of endorsed or sponsored religion is at the heart of the school prayer cases. This reflects the fundamental guarantee of the First Amendment that "government may not coerce anyone to support or participate in religion or its exercise." <u>Lee</u>, 505 U.S. at 587. The risk of coercion is heightened in the public school context: "prayer exercises in public schools carry a particular risk of indirect coercion." <u>Id.</u> The possibility of coercion is greater in schools because children are more "susceptible to pressure from their peers." <u>Id.</u> at 593; <u>see</u> <u>also</u> <u>Edwards v. Aguillard</u>, 482 U.S. 578, 584 (1987) ("Students in [elementary and secondary schools] are impressionable . . . . The State exerts great authority and coercive power . . . because of . . . the

---

[7] We review a district court's grant of summary judgment de novo. <u>Pichler v. UNITE</u>, 542 F.3d 380, 385 (3d Cir. 2008). In doing so, we apply the same standard as the district court. <u>Id.</u> That is, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether summary judgment is warranted, we "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." <u>Stratechuk v. Bd. of Educ., South Orange-Maplewood Sch. Dist.</u>, 587 F.3d 597, 603 (3d Cir. 2009) (citing <u>Norfolk S. Ry. v. Basell USA, Inc.</u>, 512 F.3d 86, 91 (3d Cir. 2008)).

children's susceptibility to peer pressure."). Thus, the Supreme Court has "recognized a distinction when government-sponsored religious exercises are directed at impressionable children who are required to attend school, for then government endorsement is much more likely to result in coerced religious beliefs." Wallace, 472 U.S. at 81 (O'Connor, J., concurring).

Marsh does not adequately capture these concerns. The Indian River School Board carries out its practice of praying in an atmosphere that contains many of the same indicia of coercion and involuntariness that the Supreme Court has recognized elsewhere in its school prayer jurisprudence. While there is no doubt that school board meetings do not necessarily hold the same type of personal and cultural significance as a high school graduation or perhaps even a football game, we take to heart the Supreme Court's observation that, in this respect, "[l]aw reaches past formalism." Lee, 505 U.S. at 595. In Lee, although the parties stipulated that attendance at the graduation was "voluntary," the Court rejected that characterization:

> Attendance may not be required by official decree, yet it is apparent that a student is not free to absent herself from the graduation exercise in any real sense of the term "voluntary," for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years. Graduation is a time for family and those closest to the student to celebrate success and express mutual wishes of gratitude and respect, all to the end of

40

> impressing upon the young person the role that it is his or her right and duty to assume in the community and all of its diverse parts.

505 U.S. at 595.

In Santa Fe, the school district also argued that attendance at a high school game was distinguishable from the "involuntary" nature of graduation exercises that Lee recognized. 530 U.S. at 311. The Supreme Court agreed that "[a]ttendance at a high school football game . . . is certainly not required in order to receive a diploma," but rejected the formalism inherent in the district's argument. Id. For certain students, namely the "cheerleaders, members of the band, and of course, the team members themselves," attendance at the football game is mandatory as part of their "seasonal commitment." Id. The Supreme Court cautioned against "minimiz[ing] the importance . . . of attending and participating in extracurricular activities as part of a complete educational experience." Id. Of course, some students may choose not to attend the games. However, for a second group of students—those who have no formal role at the football games—the event still is nonetheless a meaningful one and "the choice between attending these games and avoiding personally offensive religious rituals is in no practical sense an easy one." Id. at 312.

The Indian River Board meetings are akin to those events. It is true that attendance at the Indian River School Board meetings is not technically mandatory. Nevertheless, the meetings bear several markings of "involuntariness" and the implied coercion that the Court has acknowledged elsewhere.

41

First, like graduations, the Board's recognition of student achievement allows "family and those closest to the student to celebrate success." Id. For years, the Indian River School Board has used its regular meeting to recognize student accomplishment of various types. These are awards that were previously given out at student assemblies, but the Board deliberately decided to change the location of the awards to its meetings. This change had the effect of ensuring student attendance at nearly all the Board meetings that take place during the school year. Over the years, hundreds of individual students and students groups have attended a Board meeting in order to be recognized for their academic, athletic, or artistic skills and achievements. Their families are asked to join them in the celebration. At the meeting, the student's name is called and they are presented with a letter commemorating the experience. The award is reflected in the minutes and may be published in the local newspaper. Thus, by virtue of the way in which it gives out these awards, the Board does more than casually celebrate student accomplishments; it effectively cloaks them in official recognition.

Therefore, like commencement exercises, a student who decides not to attend the meeting will "forfeit . . . intangible benefits" that "have motivated the student." Lee, 505 U.S. at 595. They will be giving up an opportunity to "celebrate success and express mutual wishes of gratitude and respect." Id. Of course, attendance at a meeting of the Board does not bear all of the same hallmarks of personal and cultural significance that a high school graduation ceremony does. It may not be "one of life's most significant occasions." Id. at 595. It may not be as exciting an event as a football

game. But the Indian River School Board has deliberately made its meetings meaningful to students in the district. The significance of the awards portion of the meeting is borne out by Bireley's testimony. Bireley testified that it was an "honor for [the students] to come to receive an award" at the meetings. JA 393. These awards are such an important part of student life that Bireley was not aware of any instance where a student declined to attend the meeting to receive an award, other than for a scheduling conflict.

Thus, for these students, the meetings are a culmination of their extracurricular activities.[8] This has additional implications for awards given out to teams. In situations where entire teams are honored, a student may feel especially coerced to attend a meeting where the Board recites a prayer. A student may feel pressure to attend the meeting with their team; to do otherwise could be construed as abandoning the team. At the very least, a team member who absents herself will not receive the same tangible and intangible benefits as her teammates.

---

[8] For example, the Board "recognized and presented certificates" to the following individuals and teams "for their accomplishments" at the April 26, 2005 meeting: 28 students belonging to the 2005 Odyssey of the Mind Team; four members of the JROTC State Champion Shooting Team and three members of the JROTC State Champion Color Guard of the Indian River High School; two state wrestling champions from Indian River High School, two students who won first place at the "Science Olympiad;" four students who won first place at a Future Farmers of America competition; and ten members of the Academic All-State Wrestling Team from the Indian River High School.

43

In this context, the Supreme Court's observation that students are particularly vulnerable to peer pressure in social context is an important one. Santa Fe, 530 U.S. at 311-12 ("We stressed in Lee the obvious observation that adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention.") (internal citations and quotation marks omitted). Given this pressure, we question whether an individual team member will feel free to choose *not* to attend the meeting in order to avoid participating in the prayer when the rest of the team is being honored at the meeting. The existence of such pressure is borne out by a critical fact in the record: students have never decided *not* to attend the meetings, other than for a scheduling conflict.

Moreover, for at least some students, attendance at the Board meetings is more formally *part* of their extracurricular activities, and thus is closer to compulsory. JROTC members are one example. Every Board meeting begins with a "presentation of the colors" of the high school where the Board meeting is taking place. There are only two such JROTC programs, and thus the students in the JROTC must attend the meetings.

Attendance also borders on compulsory for student government representatives. Student government members are invited to the Board meetings in their official capacity as representatives of the two local high schools. Their presentations to the Board are a specific part of the Board's agenda. The record confirms that student government leaders routinely attend the meetings and speak on a wide variety of issues relating to the student experience in the Indian River

44

School District. Thus, they directly represent student interests at the Board's meeting. The meeting gives student government representatives—and therefore all the students—an opportunity to draw attention to issues that affect their educational experience. As befits their role, student representatives may speak on a number of different issues. An example from the minutes illustrates the nature of these presentations. At the March 22, 2005 Board meeting, a student representing Sussex Central Student Council gave a lengthy presentation identifying the issues affecting the student body, including students' reactions to the new school lunch menu, the themes and locations of the school's upcoming prom, the result of efforts to raise funds for disaster relief, problems with the athletic fields, accomplishments at various athletic competitions, efforts by the guidance office to assist with college applications, and the administration of state educational exams.

To say that the attendance of student government representatives is not part of their extracurricular obligations is to undermine the contributions these students make to their school and their communities. In this regard, they are more like the "cheerleaders, members of the band, and, of course, the team members themselves, for whom seasonal commitments mandate their attendance" at football games. Santa Fe, 530 U.S. at 290. [9]

---

[9] For these reasons, we also disagree with the District Court's conclusion that school board meetings are unlike extracurricular activities because they are not "important" or "part of a complete educational experience."

The Board argues that its meetings are distinguishable from graduations because "audience members, including students, may freely enter and exit—and they do. If Appellants or anyone else finds it truly intolerable to hear a brief prayer they can easily absent themselves for that short portion of the meeting." Appellee Br. 29. They point out that, under Lee, "the ability to come and go freely without notice or interference is highly relevant to the inquiry." Id.

Appellees misunderstand the lesson in Lee. Simply put, giving a student the option to leave a prayer "is not a cure for a constitutional violation." Lee, 505 U.S. at 596; see also Engel, 370 U.S. at 425; Santa Fe, 530 U.S. at 312. "It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice." Lee, 505 U.S. at 596. The First Amendment does not allow the state to force this kind of choice upon a student.

Additional contextual elements of the Board meetings betray the possibility that students will feel coerced into participating in the prayer practice. The meetings take place on school property. The Board retains complete control over the meeting; it sets the agenda and the schedule, for example. Cf. Lee, 505 U.S. at 597 ("At a high school graduation, teachers and principals must and do retain a high degree of control over the precise contents of the program, the speeches, the timing, the movements, the dress, and the decorum of the students."). It is in this context that the Board itself composes and recites the prayer. Thus, the Board is involved in every aspect of the prayer. In these circumstances, it is particularly difficult to imagine that a student would not feel pressure to participate in the practice,

46

or at least appear to agree with it—particularly a student appearing in front of the Board to contest a disciplinary action.

Second, regardless of whether the Board is a "deliberative or legislative body," we conclude that Marsh is ill-suited to this context because the entire purpose and structure of the Indian River School Board revolves around public school education. The District Court's starting position was that Marsh applied because the School Board was a "legislative body." We find this analysis unpersuasive. To conclude that, merely because the Board has duties and powers similar to a legislative body Marsh applies, is to ignore the Board's role in Delaware's system of public school education.

Every aspect of the Indian River School Board is intended to promote and support the public school system. By statute, the Board's purpose is to "administer and to supervise the free public schools of the . . . school district" and "determine policy and adopt rules and regulations for the general administration and supervision" of the schools. 14 Del. C. § 1043. All of the Board's policy making responsibilities are aimed at educating students or otherwise administering the public school system. For example, the Board determines the number of hours in a school day, enforces school attendance, evaluates schools within the District, decides whether to establish kindergartens, sets the "educational policies" of the school, "adopt[s] courses of study; purchases textbooks and other equipment," and "appoint[s] personnel." 14 Del. C. § 1049. More generally, the Board also has the responsibility of "prescrib[ing] rules and regulations for the conduct and management of the

47

schools." Id. at § 1049(2). Even the power to levy taxes—which the Board points out is a hallmark of a legislative body—is limited to "school purposes." Id. at § 1902.

The Board's responsibilities serve to further highlight the compulsory nature of student attendance at Board meetings. A student wishing to comment on school policies or otherwise participate in the decision-making that affects his or her education *must* attend these meetings. Thus, while such meetings may technically be "voluntary," in practice they are not. The First Amendment does not require students to give up their right to participate in their educational system or be rewarded for their school-related achievements as a price for dissenting from a state-sponsored religious practice. Lee, 505 U.S. at 593-94 (recognizing that, for elementary and secondary school students, the government cannot force one to choose between appearing to participate in state-sponsored religious practice or protesting). As the presence of hundreds of students, parents, teachers, and community members at the Board's contentious August 24, 2004 meeting makes plain, Board meetings are the site of community discussion about school policies and events.

In this respect, we find the Sixth Circuit's discussion of the role of school boards instructive. In Coles v. Cleveland Board of Education, 171 F.3d 369, 371 (6th Cir. 1999), the Court of Appeals confronted the same question we have before us: "Are the prayers in question more like 'school prayers' prohibited by Lee or closer to 'legislative prayer' permitted by Marsh?" The Sixth Circuit held that the purpose and nature of the school board "remove[d] it from the logic in Marsh and . . . place[d] it squarely within the history and precedent concerning the school prayer line of cases." Id. at

381. The court identified several features of the school board's structure that distinguished it from a traditional legislative body:

> Although the school board, like many other legislative bodies, is composed of publicly elected officials drawn from the local community, that is where the similarity ends. . . . Simply stated, the fact that the function of the school board is uniquely directed toward school-related matters gives it a different type of "constituency" than those of other legislative bodies-namely, students. Unlike ordinary constituencies, students cannot vote. They are thus unable to express their discomfort with state-sponsored religious practices through the democratic process. Lacking a voice in the electoral process, students have a heightened interest in expressing their views about the school system through their participation in school board meetings. . . . .
>
> [U]nlike officials of other legislative bodies, school board members are directly communicating, at least in part, to students. They are setting policies and standards for the education of children within the public school system, a system designed to foster democratic values in the nation's youth, not to exacerbate and amplify differences between them. . . .
>
> Meetings of the board serve as a forum for students to petition school officials on issues

affecting their education. Simply put, students do not sit idly by as the board discusses various school-related issues. School board meetings are therefore not the equivalent of galleries in a legislature where spectators are incidental to the work of the public body; students are directly involved in the discussion and debate at school board meetings.

Id. at 381-82.

We agree with the Sixth Circuit's analysis. The very purpose of the Indian River School Board distinguishes it from other deliberative bodies. For this reason, the fact that other courts have extended Marsh to other legislative or deliberative bodies is not relevant. See Pelphrey v. Cobb Cnty., 547 F.3d at 1276 (county commission meetings); Simpson v. Chesterfield Cnty. Bd. of Supervisors, 404 F.3d 276, 281 (4th Cir. 2005) (county board of supervisors); Snyder, 159 F.3d at 1228 (city council).[10]

---

[10] Other Courts of Appeals have also been cautious in extending Marsh beyond legislative sessions. See, e.g., Coles, 171 F.3d at 381 ("As far as Marsh is concerned, there are no subsequent Supreme Court cases. Marsh is one-of-a-kind."); Mellen v. Buntin, 327 F.3d 355, 370 (4th Cir. 2003) (refusing to apply Marsh to daily "supper prayer" at state-operated military college because "Marsh is applicable only in narrow circumstances" and supper prayer at the military institute "does not share Marsh's 'unique history.'"; Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1076 (2d Cir. 1997) (expressing reluctance to apply Marsh to inmate's compulsory participation in Alcoholics Anonymous program

We begin by noting that the District Court's reasoning ignores Marsh's suggestion that the presence of children would affect its calculus. In its historical analysis of legislative prayer, the Marsh Court cited to several statements and letters from the Founding Fathers, concluding that this "interchange emphasizes that the delegates did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one religious view." 463 U.S. at 792 (internal citations and quotations omitted). Yet the Court expressed a note of caution: "Here, the individual claiming injury by the practice is an adult, presumably not readily susceptible to religious indoctrination, or peer pressure." Id. (internal citations and quotations omitted).

Moreover, although the Marsh Court referenced "other" deliberative bodies, Marsh's entire approach rests on the long-standing and "unique" history of legislative prayer. There may be some truth to the District Court's conclusion that, "nothing in Marsh . . . suggests that the Court intended to limit its approval of prayer . . . to those [legislative and deliberative bodies] that were in existence when the First Amendment was adopted." Id. at 537-38. However, at least one Supreme Court decision after Marsh suggests that Marsh's analysis is not suitable to public schools. In Edwards v. Aguillard, 482 U.S. 578 (1987), the Court addressed the question of whether Louisiana's "Creationism Act," which forbade the teaching of the theory of evolution in public elementary and secondary schools unless accompanied by

because Marsh "relied heavily on the long tradition of public prayer in the [legislative context]").

51

instruction in the theory of "creation science," violated the Establishment Clause.  Id. at 581-82.  Explaining that the appropriate legal test was Lemon, the Court warned that Marsh's historical approach "is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted."  Id.

We find additional support in the Supreme Court's subsequent treatment of Marsh.  The Court has consistently emphasized the narrow, historical underpinnings of Marsh and has proven reluctant to extend Marsh outside of its narrow historical context.  See, e.g., McCreary Cnty., Ky. v. Am. Civil Liberties Union, 545 U.S. 844, 860 n.10 (2005) (describing Marsh as a "special instance[]"); Allegheny, 492 U.S. at 603-05 (1989) (while Marsh recognized a "unique history" of legislative prayer, it "plainly does not stand for the sweeping proposition . . . that all accepted practices 200 years old and their equivalents are constitutional today"); Wallace, 472 U.S. at 63 & n.5 (explaining that since Lemon was adopted, only Marsh has been decided "without resort to [the] three-pronged test" and Marsh was "based primarily on . . . long historical practice") (Powell, J., concurring).  Only one Supreme Court case has drawn extensively on Marsh's historical analysis, and, even in that case, the Court ultimately applied the Lemon test to determine that a city's display of the nativity scene violated the Establishment Clause.  See Lynch v. Donnelly, 465 U.S. 668, 673-74 (1984).

Appellees argue that "to suggest that Board prayer becomes unconstitutional simply because a handful of students . . . attend a monthly meeting where a sixty-second prayer is offered, is absurd."  Appellee Br. 31.  This

overstatement does not reflect our holding.[11] The *"mere presence"* of students at a legislative session is not what makes the Indian River policy unconstitutional. Our decision is premised on careful consideration of the role of students at school boards, the purpose of the school board, and the principles underlying the Supreme Court's school prayer case law. It does not endanger the centuries-long practice of prayer at legislative sessions.[12] We are tasked with "protect[ing] freedom of conscience from subtle coercive pressure in the elementary and public schools." Lee, 505 U.S. at 592. In the public school context, the need to protect students from coercion is of the utmost importance.

In sum, because we find that the type of potentially coercive atmosphere the Supreme Court asks us to guard against is present here, because of the nature of the relationship between the Board and Indian River students and schools, and in light of Marsh's narrow historical context, we

---

[11] Moreover, we question whether the length of the prayer would even be a relevant consideration. See Engel, 370 U.S. at 436 (fact that 22-second prayer was "brief" or "general" did not render it constitutional); see also Schempp, 374 U.S. at 225 ("[I]t is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment.").

[12] For the same reason, we reject the District Court's conclusion that, if "the mere presence of school children were enough to invalidate prayers in legislative and other deliberative bodies," then the practice of prayer "would be unconstitutional in virtually every setting."

53

hold that the District Court erred in applying the legislative exception to the Indian River Prayer Policy.

**V.**

**A.  The Establishment Clause Tests**

Having decided that this case is controlled by the principles in Lee v. Weisman, we must next decide whether the Indian River Policy violates the Establishment Clause.[13] In this regard, we confront another threshold question—what Establishment Clause "test" to apply.  In the public school context, the Supreme Court has been inclined to apply the Lemon test.  See Grand Rapids Sch. Dist. v. Ball, 473 U.S. 373, 383 (1985) (noting that the Court has "particularly relied on Lemon in every case involving the sensitive relationship between government and religion in the education of our children").  However, we note that Lemon has "been the subject of critical debate in recent years."  Am. Civil Liberties Union of New Jersey v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1484 (3d Cir. 1996).  "[I]ts continuing vitality has been called into question by members of the Supreme Court and by its noticeable absence from the analysis in some of the Court's recent decisions."  Id.; see also Van Orden v. Perry, 545 U.S. 677, 686 (2005) (describing Supreme Court's reluctance to apply Lemon).  Under Lemon, a three-part inquiry determines whether a challenged government action is

---

[13] In the District Court, both parties moved for summary judgment.  On appeal, there are no disputed issues of material fact and the parties briefed the constitutionality of the Policy under Lemon.  Therefore, we find it appropriate to address the merits of this issue.

constitutional under the Establishment Clause: "(1) whether the government practice had a secular purpose; (2) whether its principal or primary effect advanced or inhibited religion; and (3) whether it created an excessive entanglement of the government with religion." 403 U.S. at 612-13.

The "endorsement test" advocated by Justice O'Connor in her concurrence in Lynch v. Donnelly, 465 U.S. 668 (1984), has emerged as an alternative. Under the endorsement test, "[w]hat is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." Lynch, 465 U.S. at 692 (O'Connor, J., concurring). This analysis adopts the viewpoint of a "reasonable observer familiar with the history and context of the display" and asks whether they "would perceive the display as a government endorsement of religion." Borden v. Sch. Dist. of Twp. East Brunswick, 523 F.3d 153, 175 (3d Cir. 2008) (citing Modrovich v. Allegheny Cnty., Pa., 385 F.3d 397, 400 (3d Cir. 2004)). The Supreme Court applied the "endorsement test" in its most recent school prayer case. Santa Fe, 530 U.S. at 308. The endorsement test and the second Lemon prong are essentially the same. Black Horse Pike, 84 F.3d at 1486 ("Whether 'the endorsement test' is part of the inquiry under Lemon or a separate inquiry apart from it, the import of the test is the same."); see also Freethought Soc. of Greater Philadelphia v. Chester Cnty., 334 F.3d 247, 269 (3d Cir. 2003) (describing "effect" prong of Lemon as a "cognate to endorsement").

This Court has applied both tests. See Busch v. Marple Newtown Sch. Dist., 567 F.3d 89, 100-01 (3d Cir. 2009) (applying Lemon); Borden, 523 F.3d at 175 (applying endorsement test); Black Horse Pike, 84 F.3d at 1484

(applying <u>Lemon</u> but noting that it had been "the subject of critical debate in recent years").  Because <u>Lemon</u> has not been overruled, we will apply it here.  However, as we have done elsewhere, "[i]n light of the critique of the <u>Lemon</u> test," we will "also consider [the] claim that the [Board's Policy] fails the 'endorsement test.'"  <u>Stratechuk v. Bd. of Educ., South Orange-Maplewood Sch. Dist</u>.,  587 F.3d 597, 603 (3d Cir. 2009); <u>see</u> <u>also</u> <u>Modrovich</u>, 385 F.3d at 406 ("we will apply both the endorsement test and the <u>Lemon</u> test, in case a higher court prefers to apply the traditional <u>Lemon</u> test").

## B.  The <u>Lemon</u> Test[14]

---

[14] We find it useful to begin by commenting on one aspect of the District Court's application of <u>Marsh</u> to the present case. The District Court acknowledged that Doe felt "pressured" to participate in the Board's prayer by bowing her head but "nonetheless conclude[d] that" plaintiff's testimony "d[id] not render the Board's Prayer Policy unconstitutional."  685 F. Supp.2d at 594.  The Court also stated that "[p]laintiffs have offered no evidence that any student has felt coerced or pressured to participate in a prayer given during a public Board meeting."  685 F. Supp.2d at 594.  We disagree with this analysis.  Plaintiff Doe clearly claimed that she felt coerced into participating in the prayer.  Therefore, the court erred in relying on the absence of additional evidence of injury to find the Board Prayer Policy constitutional.  There is no "de minimis" defense to a First Amendment violation. <u>Elrod v. Burns</u>, 427 U.S. 347, 374 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); <u>see</u> <u>also</u> <u>Schempp</u>, 374 U.S. at 225 ("[I]t is no defense to urge that the

56

Proceeding under <u>Lemon</u>, "the challenged action is unconstitutional if (1) it lacks a secular purpose, (2) its primary effect is to either advance or inhibit religion, or (3) it fosters an excessive entanglement of government with religion. <u>Modrovich</u>, 385 F.3d at 401 (citing <u>Lemon</u>, 403 U.S. at 612-13).

## 1. The Secular Purpose Prong

"In applying the purpose [prong]," we ask "whether government's actual purpose is to endorse or disapprove of religion." <u>Wallace</u>, 472 U.S. at 56 (internal quotations marks omitted). Under <u>Lemon</u>, if the statute has *some* secular purpose, then it survives the first prong. <u>Freethought</u>, 334 F.3d at 262 ("[T]he purpose prong of <u>Lemon</u> only requires some secular purpose, and not that the purposes . . . are exclusively secular.") (quotations omitted). The stated secular purpose, however, must be sincere and not a mere sham. <u>Edwards</u>, 482 U.S. at 586.

The Board argues that the purpose of the Prayer Policy is to "solemnify" its meetings, and thus that the Government has a secular purpose in promoting prayer. We will not take issue with the appellees' characterization of their policy, which we note is "entitled to some deference." <u>Santa Fe</u>, 530 U.S. at 308. However, even assuming the Board's primary purpose is to solemnify the meetings, we nonetheless hold that the Policy violates the Establishment Clause because, as

religious practices here may be relatively minor encroachments on the First Amendment.").

57

we determine below, its primary effect is to advance religion and it fosters excessive government entanglement in religion. See Stone v. Graham, 449 U.S. 39, 41 (1980) ("If a statute violates any of these three principles [of Lemon], it must be struck down under the Establishment Clause.").

## 2. The Primary Effect Prong

Under the second prong of Lemon, a state's practice "can neither advance, nor inhibit religion." Black Horse Pike, 84 F.3d at 1486. This means that "regardless of its purpose," the government practice "cannot symbolically endorse or disapprove of religion." Busch, 567 F.3d at 100. As explained earlier, the second prong of Lemon is akin, if not identical, to the endorsement test.[15] Black Horse Pike, 84 F.3d at 1486. This Court "must determine whether, under the totality of the circumstances, the challenged practice conveys a message favoring or disfavoring religion." Id. In doing so, we adopt the viewpoint of the reasonable observer and may take into account "the 'history and ubiquity' of [the] practice," since it "'provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion.'" Id. (quoting Sch. Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390 (1985)).

Appellees concede that the Prayer Policy has "the incidental effect of advancing religion." Appellee Br. 52.

---

[15] For that reason, cases discussing both are useful. See, e.g., Stratechuk, 587 F.3d at 606 (using case law and language describing the endorsement test to set forth the "effect prong" of the Lemon test).

They argue nonetheless that there is "no evidence from which a reasonable observer could conclude that advancing religion is the prayer policy's primary effect." Rather, the primary purpose of the Policy is to solemnify the Board's proceedings. For the two reasons that follow, we find that the Policy impermissibly endorses religion.

First, the largely religious content of the prayers would suggest to a reasonable person that the primary effect of the Policy is to promote Christianity. Of course, by its very terms, the Policy permits references to any religious figure and allows non-sectarian prayer. As discussed earlier, the majority of the prayers delivered by the Board are—by the Board Members' own admission—sectarian. Only occasionally have Board Members used this opportunity to propose a moment of silence. These prayers therefore constitute "religious activity." Lee, 505 U.S. at 603 (Blackmun, J., concurring) ("In the words of Engel, the Rabbi's prayer 'is a solemn avowal of divine faith and supplication for the blessings of the Almighty. The nature of such a prayer has always been religious.'") (citation omitted). We will again cite to the following example as an illustration:

> Dear Heavenly Father, among Your many blessings, we thank You for the beautiful summer weather and especially for the much needed rain. We thank You also for the wonderful school year that has just ended with so many successes, awards, and accomplishments of our students and staff once again. We ask Your continued blessings on those among us who have devoted so much time, energy, and expertise to the betterment of

59

this district and who are now stepping down. Given them peace, health, and happiness in the days to come. Be with our people who have suffered illness or injury this year, and grant them a quick return to normal life. Comfort the families of those who are lost to us and give them strength in their time of grief. Protect all who are here and return them to us safely in the fall. We ask that You continue to guide and direct us in . . . our decision-making, so that every child in this district receives the educational skills to be all he/she can be. We ask these things and all others in the name of Jesus Christ, our Lord. Amen.

Indian River, 685 F. Supp. 2d at 547.

Given that the prayers recited are nearly exclusively Christian in nature, including explicit references to God or Jesus Christ or the Lord, we find it difficult to accept the proposition that a "reasonable person" would not find that the primary effect of the Prayer Policy was to advance religion.

Appellees maintain that the purpose and effect of the prayer is to solemnify the meetings. It is true, as the previous example reveals, that the prayers ask for guidance on school-related matters. In this respect the Indian River policy is similar to the policy the Supreme Court considered in Santa Fe, whose stated purpose was also to "solemnize the event." 530 U.S. at 306. The Court acknowledged that "[a] religious message is the most obvious method of solemnizing an event." Santa Fe, 530 U.S. at 306. However, the fact that the purpose of the policy is to solemnify the Board meetings does

not mean that it does not also impermissibly endorse religion. The two are separate components of our inquiry. See Borden, 523 F.3d at 177-78 ("First, the inquiry is not whether Borden intends to endorse religion, but whether a reasonable observer, with knowledge of the history and context of the display, would conclude that he is endorsing religion."). The second prong of the Lemon test asks us to adopt the viewpoint of a reasonable observer, regardless of what purpose the Board might have had. In light of that obligation, we find that a reasonable observer would view the content of the Board's prayers as promoting religion.[16]

We are also instructed to consider the "history and ubiquity" of the challenged practice in assessing how a reasonable person would view it. Our decision in Borden showcases the significance of the history and context of a contested practice to its constitutionality. In Borden, we tackled the head high school football coach's practice of "engag[ing] in the silent act[] of bowing his head during his team's pre-meal grace and taking a knee with his team during a locker-room prayer." Id. at 158. Borden, who had been the

---

[16] Since enacting the Policy, the Board recites a disclaimer prior to delivering the prayer (although the disclaimer is not mandated by the Policy). However, the disclaimer does not render the Board's practice constitutional. See Black Horse Pike, 84 F.3d at 1482 ("The disclaimer required . . . does help to recapture some of the separation between church and state that has been obscured by the state's control over the graduation. However, the Board cannot sanction coerced participation in a religious observance merely by disclaiming responsibility for the content of the ceremony.").

head football coach since 1983, had a long history of engaging in similar conduct:

> For twenty-three years, Borden led the team in a pre-game prayer in the locker room. During that same period of time, Borden orchestrated a pre-meal grace for his team. He originally had a chaplain conduct the pre-meal grace. This practice changed only after school officials asked him to stop; then he had the chaplain write the grace and he selected seniors on the team to recite it. Additionally, during at least three seasons, Borden led the team in the first prayer of the season. Both of these activities, the locker room preparations and the pre-game meals, were school-sponsored events.

Id. at 176. Relying in part on "the history of Borden's conduct with the team's prayers" we found that "his acts cross the line and constitute an unconstitutional endorsement of religion." Id. at 178. We drew support from Santa Fe, where in addressing the constitutionality of a prayer recited over loud speakers at football games, the Supreme Court "considered the many years of pre-game prayers at the school, and the evolution of the policy, including the name 'Prayer at Football Games' and its stated purpose." Id. at 176 (citing Santa Fe, 530 U.S. at 308-09).

The history and context of the Indian River Policy is similarly revealing. Prayer in school and at school events has been a contentious issue in the Indian River School District for some time. In fact, the Board's decision to write an official prayer policy grew out of this debate and efforts to

62

stall a possible civil action against the Board. The original event to kindle this heated debate was the Indian River School District's policy of permitting official prayer at school graduations. While that claim eventually settled, the underlying events inform our understanding of the history of prayer in the District. In 2004, recall, the School District invited a pastor to recite an "invocation and benediction" at one of the district high school graduation ceremonies. Indian River, 685 F. Supp. 2d at 528. The benediction "explicitly invoked Jesus Christ. For example, in the benediction, Reverend Fike stated: 'Heavenly Father . . . direct [graduates] into the truth, and eventually the truth that comes by knowing Jesus.'" Id.

Mona Dobrich, one of the original plaintiffs, complained about the prayer during the Board's regularly-scheduled meeting on June 14, 2004. Id. at 529. Dobrich's complaint garnered significant media attention from Delaware newspapers. News that the ACLU was threatening to sue the District spread quickly and the complaint was widely reported by the local news media. At the Board's July 27, 2004 meeting, "[t]hirteen residents, including five religious leaders, spoke up both for and against allowing prayer at the district's functions, particularly graduation ceremonies."[17] JA 81. "[M]ore than 100 people attended [the meeting] with the majority interpreting Dobrich's request as a move to stifle their religious freedom and to degrade the moral fiber of the community." JA 81. One newspaper described some of the comments made:

---

[17] A different newspaper report stated that 11 people made statements.

Pastor Richard Blades . . . spoke of Biblical mandate for prayer in Jesus' name, adding, "our school district has prayed in Jesus' name for many, many years." Pastor Marvin Morris received hardy applause after suggesting doing away with prayer will lead to an erosion of [the] community's foundations. Another offered the opinion that if it hadn't been for prayer, the school district could be in a greater mess than it currently is.

Those on the other side of the debate argued for tolerance and acceptance of all faiths . . . .

Mona Dobrich, the Jewish mother who first brought the issue to the public's attention, read a prepared speech, charging the district with a legal obligation to do away with secular prayer.

JA 81.

The Board grew concerned that it would be the subject of a lawsuit. Dobrich, 380 F. Supp. 2d at 371. The District Court explained what happened next:

On August 23, 2004, the Board convened a special meeting to discuss prayer at the beginning of Board meetings. According to the minutes of that session, which lasted several hours, "several board members expressed that their constituents d[id] not want the Board to change its practice of opening the meetings with a prayer."

<u>Indian River</u>, 685 F. Supp. 2d at 529. The Board's next regularly-scheduled meeting took place the next day. This meeting:

> attracted more than twice the attendance of a typical public meeting. At the beginning of the meeting, then-Board President Walls asked Board Member Hattier to "lead the Board in a moment of prayer." Several members of the crowd applauded. President Walls gaveled the room back to order. [Board] Member Hattier then gave [another prayer]. . . . . During the portion of the meeting devoted to public comments, several attendees spoke in favor of continuing the practice of having an invocation at public school graduations and other school events.

<u>Id.</u>

A newspaper reported that approximately 800 people attended the meeting, "a majority . . . [of whom] supported the board's decision to open with prayer and continue the practice at commencement." JA 202. Jane Doe testified that attendees were shouting "Amen" and "hallelujah" during the meeting. JA 135. The newspaper article confirmed this: attendees "shouted out 'Amen' or 'Praise Jesus' after scripture passages were quoted during the public comment period." JA 202. The article goes on to describe the attendees holding signs reading "Jesus is the Light of the Word" and "Let us Pray, God is Listening." JA 202. In addition, "[l]ocal churches and community members

65

organized a prayer vigil before the meeting." JA at 203. One community member "present[ed] the board with a petition signed by 320 people who want to see prayer continued at graduation." JA at 203. The meeting was also attended by several state representatives. During the public comment period, one of them stated to the Board, "You have the public behind you . . . If you do not do the right thing, the public will take you out, not the ACLU." JA 87. Board Member Bireley conceded that the vast majority of comments at the meeting were "probably" intended to be intimidating to opponents of school board prayer. JA 415.

This history is illuminating. This sequence of events shows that the Board's Prayer Policy is closely linked to the desire to maintain prayer at Indian River school events, including at graduations. After all, it was in response to this community uproar that the Board was compelled to draft a formal Prayer Policy. Indian River, 685 F. Supp. 2d at 529. These events also show how the public viewed the prayer issue. As exemplified by the August 24, 2004 meeting, there was clearly broad support among community members for the practice of prayer at the School Board meetings and District graduations. Not only did most of the attendees support the Board's practice, but their conduct reveals that in the minds of many, the issue of prayer at the Board meetings and graduations was closely intertwined with religion. In Board Member Helms's words, "it was apparent to me that not only did they want to take away prayer before graduation, but they wanted to take my right to pray at a Board meeting." JA 767. The Policy was drafted in order to safeguard against a potential lawsuit challenging the Board's unwritten practice of praying at every public meeting. The Policy was also drafted in an atmosphere of contention and hostility towards

66

those who wanted prayers to be eliminated from school events. A reasonable person aware of this history would conclude that the primary effect of the Board's Policy was to endorse religion.

### 3. The Excessive Entanglement Prong

Part three of the Lemon test provides that government conduct may "not foster an excessive government entanglement with religion." Lemon, 403 U.S. at 613. "[T]o assess entanglement, we have looked to 'the character and purpose of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.'" Agostini v. Felton, 521 U.S. 203, 233 (1997) (quoting Lemon, 403 U.S. at 615). We must also bear in mind that "excessive entanglement" "requires more than mere '[i]nteraction between church and state,' for some level of interaction has always been 'tolerated.'" Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 534 (3d Cir. 2004) (Alito, J.) (quoting Agostini, 521 U.S. at 233).

Several institutional aspects of the recitation of the prayer are troubling. The prayers are not spontaneous, but a formal part of the Board's activities. The Board explicitly decided that a prayer or a moment of silence should be part of every School Board meeting. The "decis[ion] that an invocation and a benediction should be given . . . is a choice attributable to the State." Lee, 505 U.S. at 587. That level of "involvement," the Supreme Court cautions, is "troubling." Id. In this case, the Policy resulted from, and was sanctioned by, the Board's institutional authority in that it was enacted through a vote.

67

Second, the prayers are recited in official meetings that are completely controlled by the state. The Board sets the agenda for the meeting, chooses what individuals may speak and when, and in this context, recites a prayer to initiate the meeting. Thus, the circumstances surrounding the prayer practices suggest excessive government entanglement.

The practice and the Prayer Policy bear two additional hallmarks of state involvement: the Board composes and recites the prayer. Government participation in the composition of prayer is precisely the type of activity that the Establishment Clause guards against. See Lee, 505 U.S. at 590 ("[O]ur precedents do not permit school officials to assist in composing prayers as an incident to a formal exercise for their students."). In this case, the Board always composes the prayers recited at the public meetings. Per the Policy's stated terms, only Board Members are permitted to "offer a prayer or request a moment of silence." The Policy ensures that a prayer or moment of silence is offered at every meeting, since the duty rotates in the case that a member declines to "exercise this opportunity." Unsurprisingly, Board Members who volunteer for this duty take their responsibility seriously, carefully choosing the words and message they wish to deliver.

The composition of the prayer is "a hallmark of state involvement." See Adler v. Duval Cnty. Sch. Bd., 250 F.3d 1330, 1337 (11th Cir. 2001) ("The ability to regulate the content of speech is a hallmark of state involvement."). The Supreme Court has found that when government has been involved in the *composition* of prayer recited in front of students, this violates the principles of the Establishment

Clause. In Engel, the Supreme Court struck down a school prayer that was composed by New York State officials. The Court found it significant that the "prayer was composed by government officials as part of a governmental program to further religious beliefs." Engel, 370 U.S. at 425. At the very least, the Court explained, "the constitutional prohibition against laws respecting an establishment of religion must . . . mean that in this country it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government." Id. In Lee, the Court again drew attention to the excessive control of the state over the content of the prayer, explaining that "[t]he State's role did not end with the decision to include a prayer and with the choice of a clergyman. [The principal] provided [the rabbi] with a copy of the 'Guidelines for Civic Occasions,' and advised him that his prayers should be nonsectarian. Through these means the principal directed and controlled the content of the prayers." 505 U.S. at 588. Citing Engel, the Lee Court confirmed that the government could play "no part" in the composition of "official prayers." Id.

Another element of the Policy revealing excessive entanglement is that the Board recites the prayer. In doing so, the state's involvement goes further than in Santa Fe, where the student body elected a student volunteer, and in Engel, where students recited a prayer composed by the state. Because of the Board President's procedure for implementing the Policy, there is never a meeting where a prayer or a moment of silence is not given.

These circumstances are akin to those considered by the Fourth Circuit in Mellen v. Bunting, where the Court of

69

Appeals tackled the constitutionality of a daily prayer recited before dinner at a state military college. 327 F.3d 355 (4th Cir. 2003). In Mellen, the prayer was delivered by a chaplain employed by the state, and thus, as in this case, the government both composed and recited the prayer. The Fourth Circuit found that the military college's prayer policy was unconstitutional under the Lemon test. In assessing the "excessive entanglement" prong, the court found that the state "composed, mandated, and monitored a daily prayer for its cadets" and that, in doing so, "[the school] has taken a position on what constitutes appropriate religious worship— an entanglement with religious activity that is forbidden by the Establishment Clause." Id. at 375. "[T]he Establishment Clause prohibits a state from promoting religion by authoring and promoting prayer for its citizens." Id.

Coles is also instructive. The Sixth Circuit found that the school board practice of reciting a prayer at every meeting violated all three prongs of the Lemon test. Discussing the excessive entanglement prong, the Court of Appeals found the board's involvement "indistinguishable from the situation in Lee." Coles, 171 F.3d at 385. The following features revealed the imprimatur of the state: "The school board decided to include prayer in its public meetings, chose which member from the local religious community would give those prayers, and has more recently had the school board president himself compose and deliver prayers to those in the audience." Id.

The Board directs us to four aspects of the Prayer Policy which, in its view, show that there is no excessive entanglement. First, the Board Policy permits all types of prayers. Second, all Board Members are permitted to "lead

70

the group in accordance with his own conscience." Appellee Br. 52. Third, Board Members and the public are not required to participate in the prayer—"[t]hey are free to listen, to stand in respectful silence, or simply to think of something else. Those who are truly bothered . . . may temporarily leave." Appellee Br. 53. Fourth, the Policy does not require the expenditure of public funds.

We are not persuaded that these elements of the prayer practice disentangle the Board from its involvement in religion. While it is true that Board Members have significant flexibility in deciding what the prayer should say, they are still government actors composing and delivering prayer. Moreover, the record shows that for the most part, the prayers recited refer to one particular faith. We earlier rejected the Board's argument that a student's ability to dissent from the prayer transforms the practice into a constitutional one. Finally, we have never required that public spending be an element of excessive state entanglement in religion.

In short, the indicia of state involvement in the Board's Prayer Policy are overwhelming. Therefore, we find that the Board's complete control over the Policy, combined with its explicit sectarian content, rises above the level of interaction between church and state that the Establishment Clause permits.

## C. The Endorsement Test

The endorsement test is essentially "the same" as the second Lemon prong. Black Horse Pike, 84 F.3d at 1486. Because of the reasons we set forth for finding that the Policy

71

did not survive the "effect prong" of <u>Lemon</u>, we also find that the Policy fails under the endorsement test.

**V.**

If the history of this litigation has shown us anything, it is that the proper role of prayer in the Indian River school system has been the subject of sincere and passionate debate. Yet "[t]he question is not the good faith of the school in attempting to make the prayer acceptable to most persons, but the legitimacy of its undertaking that enterprise at all." <u>Lee</u>, 505 U.S. at 588-89. In arriving at this outcome, we recognize, as the Supreme Court has, that "religion has been closely identified with our history and government." <u>Schempp</u>, 374 U.S. at 212. But we take to heart the observation in <u>Engel</u> that "[i]t is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves." 370 U.S. at 435. In this regard, the Indian River School Board Prayer Policy rises above the level of interaction between church and state that the Establishment Clause permits.

For the reasons above, we will reverse the District Court and grant summary judgment in favor of appellants.